**FILED**

**APR 2 6 2005**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States *ex rel.*                    )   Civil Action No._____
                                           )
Julie McBride                              )   Complaint and Jury Demand
                                           )
1131 Scott Court,                          )
Geneseo, IL 61254                          )
                                           )   Date Received_____
                                           )
                                           )   Complaint filed
                                           )   **Under Seal** pursuant to 31
                                           )   U.S.C. §3730(b)(2)
                                           )
BRINGING THIS ACTION ON BEHALF             )
OF THE UNITED STATES OF AMERICA            )
                                           )
                                           )
c/o Roscoe C. Howard, Jr.,                 )
United States Attorney                         CASE NUMBER  1:05CV00828
Judiciary Center Building,
555 Fourth Street, NW,                         JUDGE: Henry H. Kennedy
Washington, 20530 c/o John Greene
                                               DECK TYPE: General Civil

and                                            DATE STAMP: 04/26/2005

c/o
Attorney General of the United States          )
U.S. Department of Justice                      )
10th and Constitution Avenues, N.W.             )
Washington, DC 20530                            )
                                                )
                                                )
vs.                                             )
                                                )
Defendants,                                     )
Halliburton Company                             )
        5 Houston Center, 1401 McKinney,        )
        Houston TX 77010                        )
And  Kellogg Brown and Root subsidiaries:       )
                                                )
Kellogg Brown & Root, Inc.,                     )
Mid-Valley, Inc.,                               )
KBR  Technical Services Inc.,                   )
Kellogg Brown & Root Engineering Corporation,   )
Kellogg Brown & Root International, Inc.         )
        (A Delaware Corporation)                )
Kellogg Brown & Root International, Inc.         )

*JURY ACTION*

(A Panamanian Corporation)                     )
BPM Minerals, LLC                              )
All of 5 Houston Center, 1401 McKinney,        )
Houston TX 77010)                              )
                                               )
Service Employees International                )
Al Moosa Tower 1,                              )
PO Box 3111, Dubai, UAE                        )

## COMPLAINT

This is a *qui tam* action under 31 U.S.C. Sec. 3729, *et al.* of the False Claims Act filed by Relator/Plaintiff Julie McBride, in the name of the United States Government and herself to recover penalties and damages arising from Defendants' (KBR *et.al.*) violations of federal requirements concerning contracts with agencies of the United States Defense Department.

## INCORPORATION OF OTHER DOCUMENTS

This Complaint hereby incorporates by reference the Relator's Statement and attached exhibits previously filed with the Department of Justice entitled *Relator's Disclosure Statement* and subtitled *Statement of Julie McBride.*

## THE PARTIES INVOLVED

1.     Plaintiff, Julie McBride of, 1131 Scott Court, Geneseo, IL 61254, was an MWR coordinator (Morale, Welfare, and Recreation) for Kellogg Brown and Root, stationed in Iraq.

2.     Defendant Halliburton Company ("Halliburton") of 5 Houston Center, 1401 McKinney, Houston TX 77010 is a publicly traded company, which wholly owns of all business entities known as KBR or Kellogg, Brown and Root, before during and after reorganization under Chapter 11. The Halliburton Annual report lists the following entities as being wholly owned subsidiaries, before during and after reorganization under chapter 11 proceedings:

Kellogg Brown & Root, Inc.

Mid-Valley, Inc.

KBR Technical Services Inc.

3

Kellogg Brown & Root Engineering Corporation;

Kellogg Brown & Root International, Inc. ( A Delaware Corporation)

Kellogg Brown & Root International, Inc. ( a Panamanian Corporation)

BPM Minerals, LLC

3.    Defendant Kellogg Brown and Root also known as KBR (and entities doing business under these names) of 5 Houston Center, 1401 McKinney, Houston TX 77010, are the prime contractors for providing MWR facilities in Iraq.

4.    Defendant Service Employees International of Al Moosa Tower 1, PO Box 3111, Dubai, UAE paid Ms. McBride. However, Ms. McBride was hired and was fired by personnel who represented themselves as officials of KBR and she was at all times treated as an employee of KBR.

5.    The Defendants are hereinafter collectively referred to as "KBR."

## JURISDICTION AND VENUE

6.    Plaintiff Julie McBride, hereby alleges causes of action under 31 U.S.C. sections 3729 *et. al.* of the False Claims Act, arising from Defendants' contracts with agencies of the United States Government Defense Department.

7.    Plaintiff, Julie McBride is the original source of all the allegations contained in the above referenced Relator's Statement and this Complaint.

8.    There has been no public disclosure of the allegations contained in the above referenced Relator's Statement or this complaint.

9.    Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. Section 3732 and 28 U.S.C. Section 1331 in that this action arises under the

laws of the United States and jurisdiction over Count III is also conferred by 31 U.S.C Section 3730 (h)

10.     The Defendants are in the business of providing services and material to the U.S. Government through its Defense Agencies and conduct business in Washington, DC

11.     Halliburton/KBR maintains offices at 1150 18th Street NW, Suite 200 Washington, DC 20036.

12.     Venue and jurisdiction are proper in the United States District Court, Washington, D.C. pursuant to 28 U.S.C. Section 1391(c) and 31 U.S.C. Section 3732 as the Defendants are a group of organizations and persons subject to personal jurisdiction in Washington, DC.

## STATEMENT OF FACTS

### A. Introduction

13.     The Defendant KBR supplies and runs MWR (Morale, Recreation and Welfare) facilities are supplied for the use of U.S. military personnel stationed in Iraq.

14.     These facilities are used by Military personnel for off duty activities.

15.     On information and belief, KBR's compensation was based, at least in part, upon the number of people who used the MWR facilities it built and managed for Agencies of the United States Military.

16.     Julie McBride decided she wanted to be involved in, and support, the U.S. war effort in Iraq.

17.     She therefore, sought employment with Halliburton/KBR which she knew to be active in the war effort.

18.    Ms. McBride was apparently an attractive candidate to the company.

19.    She was flown to Houston, Texas for training and testing, including using chemical protection suits, a Wabi Personnel test and Medical Screening.

20.    Julie McBride was deployed to Iraq in November of 2004.

21.    KBR hired Ms. McBride to serve as an MWR coordinator in Iraq.

22.    Ms McBride was scheduled to earn approximately $80,000 including base salary, hazardous duty pay and overtime per year.

23.    Ms. McBride generally enjoyed her work in Iraq and believes that her work was appreciated by the military personnel that used the MWR facilities at camp Fallujah.

24.    Initially, Ms. McBride worked the day shift for twelve hours a day, seven days a week, 6AM to 6PM.

25.    Ms. McBride's duties involved coordinating and supporting activities in the MWR facilities, as well as interacting with military personnel in the facilities.

26.    She did not initially have a reporting function, as far as accounting for the number of people who used the facility was concerned, beyond ensuring that anybody who entered an MWR facility signed in to use it.

27.    In February of 2004, Ms. McBride was allowed to work the night shift, which begins at 6PM and ends at 6AM.

28.    The night shift is generally more active and workers enjoy being able to meet with the military personnel, but it also carries the extra duty of compiling numbers for the "sit rep" report.

29.     Those numbers are reported by the MWR supervisor as the number of people who have used the facility to KBR management.

30.     The numbers compiled by coordinators are sent by the supervisor via email to Camp B-1 at Al Assad, where the KBR management for the "B" camps is located.

31.     During Ms. McBride's tenure, Camp Fallujah (B-3) had two buildings devoted to MWR.

32.     The first building was called the Fitness Center.

33.     This building included five rooms, the Weight Room, the Video Game Room, the Game Room the "AB" Room (Abdominal Weight training room) and the Theatre Space where larger activities, including dances were held.

34.     The second building was an internet café, which had approximately 40 computers and ten phones for military personnel to use and also housed a library.

35.     With as many as 18,000 U.S. military personnel on the base at the height of military activity around Fallujah, the 40 computers at the internet café were very popular as a link to the U.S.

36.     Military personnel would have to wait on line to use the computers and often worked out an arrangement to have their place in line held, while waiting in the library to use the computers.

37.     KBR employed people to staff the MWR services including, but not limited to, 9 coordinators and 1 supervisor who were U.S. employees at Camp Fallujah, while Ms. McBride was serving there.

38.     Two coordinators left during Ms. McBride's Tenure.

39.     KBR was also training two additional coordinators in the United States to replace them and add to this work force while McBride was in Camp Fallujah.

**B. KBR's Procedure to Overstate the Use of MWR Facilities**

40.     The allegations contained in paragraphs numbered 1-39 are hereby re-alleged and set forth as above.

41.     Once Ms. McBride began to work the night shift she became intimately aware of the procedure used to count the number of people who use the facility.

42.     She was trained to compile these numbers by Phil Martinez on Sunday, February 27, 2005.

43.     Mr. Martinez was also an MWR Coordinator working for KBR at the camp.

44.     The procedure is designed to overstate the use of these facilities.

45.     First, every patron who signs in to use the Fitness Center is counted as using that facility.

46.     In addition, any person who signs in to use either a computer or a phone in the internet café is also counted and added to the number.

47.     Military personnel must sign in to gain access to the fitness center or to use the computers and phones in the internet café.

48.     In addition, an hourly count of how many people are using **each** room in the Fitness Center and the Library of the Internet Café, is tabulated every hour four 24 hours per day.

49.     The hourly count is provided by third country national employees of KBR who are paid far less than the MWR coordinators.

8

50.   The hourly counts are tabulated and **added** to the number of people who have signed in to use the Fitness Center or to use a phone or computer at the Internet Cafe.

51.   In addition, any person who is signed in to participate in a particular activity, such as a chess tournament, would be counted again and added to the total.

52.   It was generally understood by all KBR personnel that the company receives funds based on how many people use the facilities.

53.   Based on this system, it is possible for the same person to be counted several times.

54.   It is likely, for example, that one military person who waited in the library of the Internet Café for an hour and a half to use a computer would be counted three times.

55.   That person could have been counted twice at the beginning of each hour while waiting on line in the library and once more for signing in to use a computer.

56.   Somebody who signed in to use the Fitness Center and worked out for a couple of hours would also, more than likely, be counted at least three times.

57.   There are dozens of military Camps in Iraq many if not most have MWR Facilities run by KBR.

58.   On information and belief, more such facilities are being constructed as the U.S. presence continues in the country.

59.   On information and belief, the methods used to inflate the number of people who attend such facilities used in the camp, which Ms. McBride personally witnessed are being used by KBR in all its facilities in Iraq.

9

60.  KBR holds contracts to provide and manage MWR facilities for the U.S. Military world wide in addition to Iraq.

## C. KBR'S Use of MWR Accounts and or Requisitions for Material and Goods Used by KBR Personnel

61.  The allegations contained in paragraphs numbered 1-60 are hereby re-alleged and set forth as above.

62.  Throughout her tenure at KBR, McBride learned of the company's standard practice to use MWR requisitions for its own material.

63.  A big screen TV that on information and belief, was ordered through MWR accounts for the MWR Fitness Center ended up in the administrative offices at KBR camp.

64.  KBR Camp was the area designated within Camp B-1 for KBR Personnel.

65.  In addition, weight machines were taken and put in a tent at KBR camp for KBR employees.

66.  Food that, on information and belief was ordered through MWR requisitions, was then siphoned for consumption by KBR employees instead of the military.

67.  For example, Ms. McBride witnessed a large amount of food that was ordered specifically for a Super Bowl party for the military.

68.  About 10 large metal tubs full of tacos, chicken wings, cheese sticks were taken from the military party site to KBR camp for a KBR Super Bowl party for KBR employees.

69.  Also, every camp that McBride visited had large glass refrigerators stocked with sodas for KBR employees to drink at will.

10

70.     On information and belief, these sodas are requisitioned by MWR or other departments.

71.     By contrast military personnel must buy soda from the "DFAC" or military dining facility.

72.     The Camp Fallujah site manager, Kevin Clarke, often stated that he was addicted to Diet Coke and kept cases of them in his office.

73.     However, Diet Coke is not sold in the PX, it has to come from the DFAC ("Dining Facility and Administrative Center") and must be requisitioned.

74.     Other administrators kept cases of sodas in their offices as well.

75.     On information and belief, KBR is using requisitions to provide sodas for KBR employees at the expense of the military.

76.     In addition, McBride's information after speaking with other KBR employees that were involved in trades, including HVAC, electricians, plumbers, is that they use requisitions for durable goods and parts through their departments to obtain materials that are then used for building and construction at KBR camps even though these materials should be for military personnel.

**D. The Relator's Termination by KBR for Engaging in Protected Activity**

77.     The allegations contained in paragraphs numbered 1-76 are hereby re-alleged and set forth as above.

78.     After her instruction as to how to account for personnel using the MWR facilities, Ms. McBride told Mr. Martinez she felt this type of accounting was fraudulent.

79.     She told him it could not possibly represent the true number of people who used the facility.

80.     Mr. Martinez essentially agreed with Ms. McBride's assessment.

81.     After expressing her concerns with the counting, on or about Monday, February 28, 2005, Ms. McBride was called into the office of the KBR Chief of Services Mike August.

82.     In addition to Mr. August, MWR Supervisor Crystal Nadeau was at this meeting.

83.     They confronted Ms. McBride about some minor time sheet clerical errors that Ms. McBride had made.

84.     During this meeting Ms. McBride became somewhat agitated about the attack on her service, and in response, raised the issue of KBR's accounting practices.

85.     On or about, Tuesday March 1, 2005, Ms. McBride again discussed the fraudulent accounting procedures with Mr. August.

86.     She also questioned him about the use of requisitions to obtain material for KBR personnel use, through MWR accounts, which McBride felt were meant to procure material for military personnel.

87.     On the same evening, McBride was called into the office of the KBR Site manager for Camp Fallujah, Kevin Clarke.

88.     Mr. Clarke simply informed Ms. McBride that she was being terminated.

89.     On our about March 2, 2005 Ms. McBride again met with Mr. Clarke and discussed her concerns with regard to KBR's business practices.

90.     Mr. Clarke ordered her put on a helicopter flight out of Camp Fallujah at approximately 2:30AM (March 3).

91.     The Helicopter flight was to camp B-1, Al Assad the KBR headquarters for all B sector camps.

92.     There, Ms. McBride met with David Stallard, the Project Manager.

93.     He told her that there was nothing he could do about her concerns.

94.     Ms. McBride was flown to Camp Victory in Baghdad.

95.     She spoke with Ralph Morales, the Human Resources Director of the "D" camps who referred her to Ted Kowalski, the In Country Human Resources Supervisor at Camp Victory South.

96.     She provided Mr. Kowalski with a written statement recounting her concerns with KBR accounting.

97.     Mr. Kowalski became visibly upset and placed Ms. McBride under the guard of three KBR security personnel.

98.     The security guards stayed outside her quarters throughout the night

99.     On three occasions security escorted McBride when she used the restroom as well as when she took a shower.

100.    McBride was not allowed to leave for any other reason and denied use of the telephone or internet.

101.    She was specifically told that she was not allowed to speak to any member of the military.

102.    McBride continued to be under guard the next morning when she was escorted to Baghdad International Airport, where she was flown out of the country.

103.    The three "reasons" given to Ms. McBride for her termination involved:

   1. Clerical time sheet errors such as using a pencil to fill in her hours on a couple of occasions as opposed to pen,

   2. An eight hour work assignment, which Ms. McBride conducted at another camp, but for which she had not gotten what KBR insisted would be proper

13

verification from a supervisor and for which she had long since declined payment and

3. "Insubordination."

104.  To the extent any of these "reasons" had any merit at all, (which Ms. McBride, of course, contests) no serious disciplinary action was taken against Ms. McBride until she confronted KBR officials with her allegations regarding KBR accounting.

105.  When she did confront KBR officials with regard to their practices she was summarily fired.

106.  Many of McBride's personal belongings are still in Iraq.

## COUNT I

## (FALSE CLAIMS ACT VIOLATIONS)

107.  The allegations contained in paragraphs numbered 1-106 are hereby re-alleged and set forth as above.

108.  The plaintiff has provided evidence to the government, which demonstrates her allegations, including her eye-witness accounts of KBR's business practices in Iraq.

109.  On information and belief the over counting techniques McBride observed and was trained to perform, were used in all camps across the Iraq theater and may extend to MWR facilities worldwide.

110.  The systematic nature of the reporting and procedures used to count the use of MWR facilities indicated that it was conducted at the direction of KBR officials and was in wide use across Iraq at the very least.

14

111.   The United States Government has been damaged to the extent of any payments resulting from KBR's knowing, willful and reckless over-counting of the use of its MWR facilities in Camp B-3 (Fallujah) as directly witnessed by the Plaintiff.

112.   The United States Government has been damaged to the extent of any payments made to KBR for use of any MWR facilities in Iraq as a result of the systematic use of the over counting procedures discovered by the Plaintiff.

113.   The United States Government has been damaged to the extent that the over counting procedures used to document the use of MWR facilities in Iraq, has led to additional such facilities or personnel being deployed to Iraq for that purpose and charged by KBR to the United States.

### COUNT II

114.   The allegations contained in paragraphs numbered 1-113 are hereby re-alleged and set forth as above.

115.   The plaintiff has provided evidence to the government, which demonstrates her allegations, including her eye-witness accounts of KBR's business practices in Iraq.

116.   On information and belief, the systematic procurement of material on behalf of KBR personnel, which the Plaintiff believes was procured using MWR accounts, was conducted throughout Iraq.

117.   The United States Government has been damaged to the extent that any such material, which was requisitioned for the use of U.S. military personnel in Iraq was actually diverted for the use of KBR personnel.

## COUNT III

118.    Based on information available at this time the paragraphs numbered 1-117 are re-alleged and set forth fully as above.

119.    The Plaintiff, Ms. McBride, by reporting to management that she objected to KBR's business practices, engaged in protected activity and has suffered adverse action and special damages pursuant to U.S.C. 31 Section 3730 subsection (h).

120.    Ms. McBride made KBR's management at Camp B-3 (Fallujah), KBR's Management at Camp B-1 which had authority over all B camps and finally KBR's senior management for Iraq aware of her allegations regarding the company's fraudulent business practices.

121.    As detailed above, each level of KBR management immediately moved to take action against Ms. McBride, when confronted with her allegations.

122.    As a direct and proximate result of reporting the allegations, KBR's discrimination and retaliation in violation of Section 3730(h), Ms. McBride has suffered adverse action and damages and is, therefore, entitled to all forms of statutory remedies to make him whole, pursuant to Section 3730(h).

123.    Therefore, Ms. McBride has suffered significant special damages and adverse action, as a direct and proximate result of discrimination from KBR because of her action to protest and attempt to stop their illegal over counting scheme and attempt to use MWR requisitions for KBR benefit.

16

## PRAYER FOR RELIEF

Wherefore, Julia McBride on behalf of herself and the United States Government prays:

a)     That Relator/Plaintiff be awarded all relief necessary to make her whole, pursuant to

U.S.C 31 Section 3730 subsection (h) as a result of her special damages including, but

not limited to physical pain and suffering, and financial damages to be determined at

trial as a result of his engaging in protected activity.

b)     That Relator/Plaintiff be awarded all reasonable attorneys fees and costs, pursuant to

31 U.S.C. Section 3730 subsection (d) (1) (b) and subsection (d) (2).

c)     That this Court enter a judgment against defendant in an amount equal to three times

the amount of damages the United States Government has sustained because of

defendants' misrepresentations and fraudulent over counting practices and any other

false violations the defendant made pursuant to work contracted  by the defendants

with agencies of the U.S. Government.

d)     That this court enter a judgment against defendant in an amount equal to three times

the amount awarded to KBR under the contracts for providing MWR services as to our

knowledge, even at this time, the fraudulent counting practices are continuing, plus a

civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. section 3729,

including each individual report of use of the facilities  and each individual requisition

for material used for KBR personnel which was intended for military use and the costs

of this action, with interest, including the cost to the United States Government for its expenses related to this action.

e)      That the Relator/Plaintiff be awarded punitive damages in an amount to be determined by jury, which shall dissuade the defendant and others from similar action;

f)      That the Relator/Plaintiff be awarded all costs incurred including reasonable attorney's fees;

g)      That in the event the United States Government continues to proceed with this action, the Relator/Plaintiff be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the actions or the settlement of the claim;

h)      That in the event that the United States Government does not proceed with this action, the Relator/Plaintiff be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of the action or settlement;

i)      That the Relator/Plaintiff be awarded pre-judgment and post judgment interest;

j)      That a trial by jury be held on all issues;

k)      That the United States Government and the Relator/Plaintiff receive all relief both at law and at equity, to which they may reasonably appear to be entitled.

**JURY TRIAL DEMANDED**

Respectfully Submitted,

Michael David Kohn
DC Bar # 425617
Kohn, Kohn & Colapinto, LLP
3233 P. Street N.W.
Washington D.C. 20007
(202)-342-6980
(202)-342-6984 (fax)
Attorneys for Julia McBride

April 25, 2005