UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES,** *ex rel.*<br>**Julie McBride,**<br><br>　　　　　Plaintiff/Relator,<br><br>　　v.<br><br>**HALLIBURTON CO.,** *et al.*,<br><br>　　　　　Defendants. | Civ. Action No. 05-CV-828 (HHK/JMF) |

**MEMORANDUM OPINION**

**I.　　INTRODUCTION**

　　This is a *qui tam* action brought by Julie McBride, the relator, against Halliburton Company and other corporate defendants, including the company relator worked for, Services Employees International, Inc. The defendants, collectively called "KBR," provided support services to the military in Iraq. Relator worked as a Morale, Welfare and Recreation ("MWR") director, and claims, *inter alia*, that KBR "inflated headcounts (collected via 'situation reports,' commonly referred to as 'Sit Reps') documenting usage of its MWR facilities in Iraq and billed the government for 'costs' that were calculated based on those inflated headcounts." United States ex rel. McBride v. Hallburton Co., No. 05-CV-828, 2007 WL 1954441, at *1-2 (D.D.C. July 5, 2007).

　　Discovery has concluded, and disputes have arisen as to (1) whether relator may assert claims as to military bases other than Camps B3 and B4, after the parties submitted expert reports as to only Camps B3 and B4 by the deadline for the submission of expert reports; (2) whether

defendants must provide additional information in response to certain interrogatories; (3) whether defendants may be compelled to do an additional search for certain electronically stored information; and (4) whether defendants should be sanctioned for not appearing at a Rule 30(b)(6) deposition that relator had noticed.[1]  I resolve each of these issues in turn.

## II. DEFENDANTS' PROTECTIVE ORDER MOTION AND RELATOR'S ADDITIONAL CLAIMS

### A. Background

Under Judge Kennedy's order, relator was to provide "expert rebuttal disclosures under Fed. R. Civ. P. 26, including expert rebuttal reports" by June 1, 2010. Order of May 3, 2010 [#102].  It is not disputed that in neither her initial expert report nor the rebuttal report did relator speak to any claims other than those based on Camps B3 and B4 under Task Order 59.

In her July 19, 2010 response to defendants' opposition to her motion to compel, however, relator indicated that she was going to claim that defendants has also perpetrated fraud at two other sites not mentioned in either her expert reports or her initial supplemental disclosures. Relator's Reply in Support of Her Motion to Compel ("Rep. Compel Docs.")[#111] at 10 n.11.  Specifically, she was going to add (1) Camps C2 Remagen and C5 Taji to her list of sites where fraud occurred, and (2) extend the pertinent time frame for which she sought damages from March 2005 to February 2006.  See Rep. Compel Docs. at 9-11.  According to defendants, the new time period invoked a different pertinent contract document, Task Order 89.

---

[1] The specific motions resolved by this Memorandum Opinion are as follows: Relator's Motion to Compel Production of Documents ("Compel Docs.") [#106]; Relator's Motion to Compel Interrogatory Responses ("Compel ROGs") [#118]; Defendants' Motion for Protective Order and Motion to Strike Supplemental Expert Report ("Mot. Prot.")[#119]; Relator's Motion for Sanctions ("Mot. Sanctions")[#135].  Where the motion has been filed both under seal and in redacted form, references are to the redacted filings.

2

Memorandum of Points and Authorities in Support of Defendants' Motion for Protective Order and Motion to Strike Supplemental Expert Report ("Prot. Memo.") [#119] at 6.

On July 19, 2010, relator served upon defendants a "supplemental report" from her expert that pertained to Camp C2 and C5. Id.  On July 22, 2010 she served a Rule 30(b)(6) deposition notice–the first deposition request she had served–that included these two camps, Task Order 89, and a time period expanded through February 1, 2006 as deposition topics. Id.

### B. The Supplemental Report Must Be Stricken

Taking the defendants' objection to the supplemental report first, it is clear that there is no right to file a supplemental expert report.  To the contrary, the order accepting the parties' Joint Motion for Adjustment of Scheduling Order [#101] clearly anticipated the conclusion of the submission of expert reports and rebuttals. Order of May 3, 2010 [#102].  It certainly did not contemplate that there would be, in effect, another round of expert reports on claims that were not asserted in the initial or rebuttal reports.

Additionally, the applicable Federal Rule does not grant a license to file a supplemental report merely because one wants to.  Rather, it imposes specific obligations upon a party to revise or supplement a previous expert report when it learns that in some material respect the expert's report or deposition testimony is "incomplete or incorrect," or by order of the court. Fed. R. Civ. P. 26(e)(1)(A).  See Coles v. Perry, 217 F.R.D. 1, 3 (D.D.C. 2003)("Fed. R. Civ. P. 26(e) does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect.").  No one is pretending that the supplemental report corrected a mistake or an incomplete statement from the first report, as one deals with Camps B3

3

and B4, and the other with Camps C2 and C5. Therefore, the motion to strike the supplemental report must be granted.

Whether relator may pursue events at Camps C2 and C5 under Task Order 89 for the period she wishes to address raises a different question to which the discovery rules do not speak. Discovery is a function of relevance, and relevance is defined by the claims and defenses asserted. Fed. R. Civ. P. 26(b)(1). The claims are asserted in the complaint, and the discovery must relate to them. Unfortunately, in this case, the parties are focusing on the discovery rules when, in my view, the true question presented is whether relator should now be permitted to amend her complaint to set forth her specific claims as to Camps C2 and C5 and any modification of the time period for which she seeks damages. Whether or not that report could speak to any issue not previously raised must be a function of whether or not relator could assert the claim at all, not whether her expert could speak to it.

Moreover, it must be recalled that the Second Amended Complaint [#52][2] was not specific. Indeed, it claimed that the "head-counts . . . were inflated not only at Camp Fallujah, but throughout Iraq." Id. at ¶ 47. Second, it was Judge Kennedy who narrowed precisely the claims that relator was asserting when he stated:

> Though the allegations undeniably are lean, McBride does allege that KBRSI submitted false claims regarding MWR headcounts. Her complaint states that payment under LOGCAP for MWR costs was based, at least "in significant part," on usage, i.e., "the number of patrons who utilize the facilities." Proposed 2nd Am. Compl. ¶ 24 ("[T]he U.S. paid KBR for the MWR facilities according to usage.").[FN18] Read in the light most favorable to McBride, this allegation may be deemed to state that Sit Rep usage statistics are

---

[2] The Third Amended Complaint [#86] involved only the addition and removal of parties, not any change in allegations. Third Amended Complaint at 1 n.1.

4

> used to calculate KBR's costs under LOGCAP. These costs are
> then submitted for payment to the government.
>
> FN18 Elsewhere in the complaint (indeed, elsewhere in the same
> paragraph), McBride retreats from this assertion, alleging that KBR
> justified its need for greater spending on MWR and inflated an
> unidentified "budget" (none exists) based on the inflated
> headcounts. Proposed 2nd Am. Compl. ¶¶ 24-25, 44. Nonetheless,
> her most direct assertion–that usage statistics were used to
> calculate the costs claimed to the government–still remains.

<u>United States ex rel. McBride v. Halliburton Co., et al.</u>, 05-CV-828, 2007 U.S. Dist. LEXIS 48112, at *30-31 (D.D.C. July 5, 2007).

As defendant explains, claims based on events in Camps C2 and C5 are based on camps in a different part of Iraq, and premised on a different operating document. Prot. Memo. at 11-12. With dispositive motions being prepared, it is certainly time for relator to state precisely what her claims are. Relator shall file a motion for leave to file an amended complaint, and Federal Rule of Civil Procedure 15 will be applied. The appropriate considerations, which are a perfect fit with the status of this case, are undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment. <u>Forman v. Davis</u>, 371 U.S. 178, 182 (1962). As to the latter, only a showing that the proposed claims will not survive a motion to dismiss permits a court to deny a motion to amend, which should otherwise be freely given. <u>James Madison Ltd. by Hecht v. Ludwig</u>, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (citing <u>Forman</u>, 371 U.S. at 181-82; <u>Moldea v. New York Times</u>, 22 F.3d 310, 319 (D.C. Cir.), <u>cert. denied</u>, 513 U.S. 875 (1994)). Application of these standards fully protects both parties and places this case in the proper procedural context.

Accordingly, I will order that <u>Defendants' Motion for Protective Order</u> be denied *pendite*

*lite*, and, in lieu thereof, relator be ordered to file a motion for leave to file an amended complaint, with the proposed amended complaint attached. Defendants will, of course, have the right to oppose and relator the right to reply.

## III. THE MOTIONS TO COMPEL

### A. Whether Relator is Entitled to More Information

As explained at the beginning of this opinion, the gravamen of relator's complaint is that defendants over-charged the United States for services it provided. By interrogatories and requests to produce documents, relator is trying to build a case showing that overpayment occurred in the form of seeking excessive reimbursement for what is called "MWR labor," which relator explains are "direct employees and subcontract laborers." Compel ROGs at 2.

Relator wishes to take the information that she has secured in discovery, in the form of voluminous documents and responses to interrogatories, and then proceed upon the theory that each claim made for each employee or subcontractor is a separate claim under the False Claims Act. See Relator's Reply in Support of Her Motion to Compel Interrogatory Responses ("Compel ROGs Reply) [#126] at 3. As I understand her assertion, she wishes defendants to provide her information so that she can create a table or chart that would resemble the following:

| Name of employee | Bates number of relevant invoice | Amount paid to employee | Line item of invoice reflecting payment |
|---|---|---|---|

According to relator, each such payment is a separate false claim, and parties to *qui tam* actions traditionally prepare these charts to summarize what the discovery has established and to simplify the presentation of the proof. See id. at 2.

Without accepting any of relator's premises, defendants insist that they have (1) already

6

produced the information from which relator can derive this information easily, and (2) provided an expert report that provides the information relator wants, and that their only dispute is that relator wants it in a different format. Defendants' Opposition to Relator's Motion to Compel Interrogatory Responses ("Opp. Compel ROGs") [#125] at 5-6.

In that same document, defendants state that they do not oppose discussing with relator's counsel "an appropriate solution to put the information regarding direct and subcontract labor charges into a more accessible format for the Court and the trier of fact." Id. at 7. Defendants indicate, however, that they are unwilling to negotiate until the dispute between the parties as to whether relator may advance claims besides those at B3 Fallujah and B4 Ar Ramadi during the period from July 1, 2004 and March 4, 2005 is resolved. Id. As a result of this opinion, that dispute will be resolved by whether relator will or will not be permitted to file an amended complaint. Since that dispute is ready to be resolved, defendants can resume the discussions as to the stipulation, with the understanding that they are not obliged to discuss any claims other than those they concede are asserted legitimately, *i.e.*, those at B3 Fallujah and B4 Ar Ramadi during the period July 1, 2004 and March 4, 2005.

I expect those discussions to commence immediately, and to be entered in good faith. I will remind the parties that I have been involved in another *qui tam* action, in which it has taken several years and thousands of dollars to finally create a useful means of presenting the claims in that action. See El-Amin v. George Washington Univ., No. 95-CV-2000, 2008 WL 4667721 (D.D.C. Oct. 22, 2008). I know that the defendants and relator certainly do not want to go down that road. I urge them to use the technology they have in a creative manner, so that whatever means of presenting the asserted claims they agree upon is useful and practical for both the

parties and Judge Kennedy. To that end, I will make myself available to assist them in any way I can. I will expect them, however, to meet me halfway.

**B.     Whether There Should be Additional Searches**

The parties negotiated the scope of electronic discovery, and ultimately reached an agreement on search terms and custodians. <u>Defendants' Opposition to Relator's Motion to Compel Production of Documents</u> ("Compel Docs. Opp.") [#108] at 3 and Exhibit C. Independently of that agreement, however, and before it was reached, defendants searched the data of custodians whom it believed were likely to possess relevant information. <u>Id.</u> at 3-4. Ultimately, it searched the data set for twenty custodians. <u>Id.</u> at 4.

Among the reports transmitted or discussed by e-mail from defendants' representatives to the United States was a document known as an "All Sites – Logistic Report" or "LOGREP." <u>See</u> Compel Docs. at 5. Relator describes these logistics reports as "monthly site reports prepared by the Defendants for the United States incorporating weekly data, including meals prepared, volume of laundry washed, and (pertinent to this case) MWR usage." Compel Docs. at 4 (internal quotations omitted). As discussed above, relator claims that defendants defrauded the United States by inflating the head counts of the number of military personnel who used the MWR facilities.

Defendants have produced the LOGREPs, and do not deny that they submitted them to the United States, although they do not concede their significance. Compel Docs. Opp at 9. Relying on the admission that defendants provided the LOGREPs to the government at some point during defendants' performance under Task Order 59 (<u>Id.</u> at 8-9), relator can establish the first element of her *qui tam* action, *i.e.*, that the LOGREP reports were submitted to the United

States. See 31 U.S.C. § 3729 (a)(1)(A)[3] (ascribing liability to "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval").

Discovery has established, and again defendants have conceded, that defendants' employees transmitted the LOGREP reports by e-mail. Compel Docs. Opp. at 8-9. On April 7, 2010, relator served a document request directed to Dorea Bratcher, demanding e-mail correspondence from Bratcher to any member of the United States government "containing, referencing, or otherwise attaching a LOGREP." Compel Docs. Opp. at 4 (quoting Compel Docs. at Exhibit G). Defendants had already produced such e-mails from other persons, and Bratcher was not on the parties' agreed list of custodians. Id. at 4-5. Defendants investigated whether they had any data for Bratcher, and determined they did not. Id. at 5. They ran additional searches in the data of the twenty custodians that relator had selected, and of the additional custodians that the defendants had searched, using more expanded search terms than those agreed to initially. Id. The voluntary searches produced a few additional responsive documents. Id.

When, on May 28, 2010, relator wrote a letter demanding production of LOGREP transmission e-mails on June 21, 2010, defendants expanded the search again. Id. The defendants searched the data for all of the custodians loaded into databases for any of defendants' current litigation matters (including those wholly unrelated to the instant case) in an effort to comply with relator's request. Id. This meant that they searched databases of 230 custodians, including four individuals whom discovery indicated were routinely copied on the LOGREP e-mails already produced. Id. All of the LOGREP transmission e-mails located were produced to

---

[3] All references to United States or District of Columbia Codes herein are to the electronic versions in Westlaw or Lexis.

relator. Id. The monthly e-mails by Bratcher from May-July 2005 and September 2005-February 2006, however, were not found. Id. at Exhibit E. Defendants asserted that, as the additional e-mails were not found in the electronic data of the custodians whom the parties agreed would be searched, defendants were under no obligation to go further. Id.

Relator now demands that the Court order defendants "to search the electronic data of each of Defendants' employees who have been 'cc'd' on those LOGREP monthly transmission emails that have been produced to Relator to date." Compel Docs. at 11.

Defendants indicate that requiring them to search the custodian data of all individuals who were carbon copied on the LOGREP e-mail correspondence already produced will add an additional thirty-five custodians whose data will have to be searched. Compel Docs. Opp. at 7. Defendants assert that this process could take months.

In support of their claim that the addition of thirty-five custodians would create a burden on defendants that would outweigh any potential benefit, defendants have submitted the declaration of Karen Ryba, the "Manager, Information Process Solutions (IPS) Security Compliance in the E-Discovery Support Department of KBR, Inc. and several related companies including Kellogg Brown and Root Services, Inc." Compel Docs. Opp., Exhibit G at ¶ 1.

In excruciating, but highly educational and useful, detail, she explains how the process and collection of data from a current or former employee takes place, from what may be many different sources, including (1) the employee's hard disk drive, which can include the original disk drive, a "ghosted" image of the drive, and self-collected copies of the drive, of which KBR IPS may possess none, one, or several collections for each identified custodian; (2) copies of current or former employees' electronic data made at different points in time in response to

10

various audits, inquiries, and litigation, which copies may include information no longer on the employees' hard drive today (or was not on the hard drive at the time of his or her departure); and (3) the employee's mailbox or "homeshare" (personal network folder), with the possibility that there could be multiple existent copies of both the mailbox and homeshare if the employee was a custodian in other matters; indeed, there are multiple sources of such data, and it is not usual for more than a dozen to exist. Id. at ¶¶ 4-7.

Once the data is found, it must be copied in a forensically appropriate manner to preserve its metadata and prevent its alteration. Id. at ¶ 8. Data collections located in a facility maintained by Iron Mountain must be sent to an offsite vendor for data extraction. Id. at ¶ 9. Since the defendants employ persons overseas, this data collection may have to be shipped to the United States, or sent by network connections with finite capacity, which may require several days just to copy and transmit the data from a single custodian. Id. at ¶ 10. Ryba estimates that each custodian averages 15-20 gigabytes of data, and collection can take two to ten days per custodian. Id. at ¶ 11.

The data must then be processed to be rendered searchable by the review tool being used, a process that can overwhelm the computer's capacity and require that the data be processed by batch, as opposed to all at once. Id. at ¶ 12. Once loaded, the data is "de-duplicated," and another KBR coordinator uses software to search it for relevance and to ascertain whether there should be any claims of privilege as to any document that appears to be relevant. Id. at ¶ 14.

All discovery, even if otherwise permitted by the Federal Rules of Civil Procedure because it is likely to yield relevant evidence, is subject to the court's obligation to balance its utility against its cost. Fed. R. Civ. P. 26(b)(2)(C). More specifically, the court is obliged to

consider whether (1) the discovery sought is unreasonably cumulative or duplicative, or obtainable from a cheaper and more convenient source; (2) the party seeking the discovery has had ample opportunity to obtain the sought information by earlier discovery; or (3) the burden of the discovery outweighs its utility. Id. The latter requires the court to consider (1) the needs of the case; (2) the amount in controversy; (3) the parties' resources; (4) the importance of the issues at stake in the action; and (5) the importance of the discovery in resolving the issues. Fed. R. Civ. P. 26(b)(2)(C)(iii).

While the present record does not permit a precise conclusion, I can presume, given the numbers of hours for which the defendants billed and the period of time at issue, that the amount in controversy is great and that the defendants' resources are greater than the relator's. Claims of fraud in providing services to military personnel raise important, vital issues of governmental supervision and public trust. Thus, these factors might weigh in favor of the discovery sought.

On the other hand, the defendants protest, and relator does not deny, that they have already spent a king's ransom on discovery in this case–$650,000–without the addition of attorneys' fees. Compel Docs. Opp at 7. They have produced more than two million paper documents, thousands of spreadsheets, and over a half a million e-mails. Id. at 1.

Given the discovery that relator has had, what defendants have already spent, and the detailed showing made of how much more time and money will likely have to spent to search an additional thirty-five custodians, surely relator has to make a showing that the e-mails not produced are crucial to her proof. She has not made such a showing, and they are not. First, she has the LOGREP reports, and no one is pretending that defendants are (or could) be asserting that, without the transmitting e-mails, she cannot establish the submission of a false claim. To

the contrary, the defendants conceded that point. Thus, the transmitting e-mails seem to be hopelessly insignificant.

In this context, it is telling that relator does not show from the e-mails she has received that there is good reason to believe that the ones she claims are missing are highly probative of some fact. Indeed, there is no showing whatsoever from what has been produced that those e-mails not produced will make the existence of some crucial fact more likely than not. It is, after all, unlikely that a transmitting e-mail will do any more than transmit attached information and, by copy, alert others of that transmittal.

Without any showing of the significance of the non-produced e-mails, let alone the likelihood of finding the "smoking gun," the search relator demands cannot possibly be justified when one balances its cost against its utility. The motion will be denied.

A final point. Relator claims that the defendants violated a government-imposed document preservation order if they are not able to produce the Bratcher e-mails. Compel Docs. at 7. It is important to keep separate, and not conflate, two distinct concepts: whether an additional search for certain information should be conducted, and whether or not the inability to find certain information should be sanctioned. The first is a question of interpreting the Federal Rules of Civil Procedure, while the second is a matter of the application of the common law principle of spoliation.

Relator remains free to argue that defendants should be sanctioned under the common law of spoliation for their inability to find the Bratcher e-mails. It is also certainly legitimate to, for example, shift the cost of searching a possible alternative source of information when one party has destroyed or failed to preserve that information through some willful or other wrongful act.

13

E.g., Cache La Poudre Feeds, LLC v. Land O'Lakes Farmland Feed, LLC, 244 F.R.D. 614, 636 (D. Colo. 2007). When, however, a party cannot produce information despite an asserted obligation to keep it, it does not thereby lose the right to argue that any additional search cannot be justified by a balancing of the factors identified in Rule 26(b)(2)(C)(iii). See Major Tours, Inc. v. Colorel, 720 F. Supp. 2d 587, 620 (D.N.J. 2010) ("The Rules compel exactly this discretionary balancing of costs and benefits of discovery, not a bright line requirement of production, no matter how burdensome, how likely to succeed, or how necessary to the litigation, if a party fails to adequately preserve every byte of previously accessible data.") (citing Disability Rights Council of Greater Washington v. Washington Metro. Transit, 242 F.R.D. 139 (D.D.C. 2007) (Facciola, J.)). If that were true, as relator seems to think, then even an entirely innocent loss of information would deprive the party who occasioned the loss of reliance upon the balancing of the factors in Rule 26(b)(2)(C)(iii) to argue against an additional search. There is nothing in the Federal Rules that could possibly justify such an extraordinary sanction, and thereby rob Rule 26(b)(2)(C)(iii) of its intended universal application.

## IV. RELATOR'S MOTION FOR SANCTIONS

As has been explained, defendants have objected to the expansions of relator's case beyond events at Camps B3 Fallujah and B4 Ar Ramadi during the period of July 1, 2004 through March 4, 2005. See Section II.A, *supra*. On July 22, 2010, relator served a deposition notice pursuant to Federal Rule of Civil Procedure 30(b)(6) that included as topics those to which defendants objected. Prot. Memo. at 6. The same day, defendants filed a notice with the Court indicating their intention to seek a protective order. Notice Regarding Relator's Motion to Compel [#115]. On July 30, 2010, defendants filed their motion for a protective order and

motion to strike the supplemental expert report, which I have now resolved by this Opinion. On August 3, 2010, the parties filed a Joint Motion for Entry of Order Regarding Rule 30(b)(6) Deposition [#122], which sought execution of the following Order:

> Upon consideration of the parties' Joint Motion for Entry of Order Regarding Rule 30(b)(6) Depositions, it is this day ORDERED that relator's Rule 30(b)(6) deposition of the Defendants shall be postponed, to be rescheduled by agreement of the parties for a date certain within 15 days following the later of (1) the Magistrate Judge's resolution of Relator's motions to compel [Docs. 106, 116] and Defendants' motion for protective order and to strike an expert report [Doc. 119], or (2) if applicable, the Court's resolution of any Rule 72 objections to the Magistrate Judge's rulings.

[Proposed] Order [#122-1].

Despite the filing of the motion, relator's counsel stated in an August 3, 2010 e-mail to defendants' counsel that he would go forward with the deposition as scheduled on August 5, 2010, if, as occurred, the Court did not sign the Proposed Order by the date set for the deposition. Mot. Sanctions at 3-4 and Exhibit 2. After further discussion, and in light of the fact that a magistrate judge had not yet been assigned,[4] relator's counsel agreed to set a new control date for the Rule 30(b)(6) deposition of August 10, 2010. Id. at 4 and Exhibit 3. In an e-mail dated August 4, 2010, defendants' counsel indicated that, in light of the proposed order filed August 3, the amended Rule 30(b)(6) deposition notice served upon defendants was not effective, and defendants would not be producing any witnesses to respond to it. Id. at Exhibit 5. In an e-mail from defendants' counsel dated August 9, 2010, he indicated again that defendants would not be producing a Rule 30(b)(6) witness, and would not attend the noticed deposition of August 10,

---

[4] While the case was referred to me on August 2, 2010, the referral was entered into the docket on August 4, 2010. See Docket No. 124.

2010. Id. at Exhibit 6.

On August 10, 2010, however, relator appeared at the courthouse with a court reporter and apparently commenced the deposition even though neither the defendants' counsel nor the witness was present. See Defendants' Opposition to Relator's Motion for Sanctions ("Mot. Sanctions Opp.) [#147] at 1. Relator seeks the fees and expenses incurred in doing that. Id.

The failure to attend the deposition was excused because the defendants "ha[d] a pending motion for protective order under Rule 26(c)." Fed. R. Civ. P. 37(d)(2). Relator is incorrect to contend, as she appears to, that it is necessary for the party who does not appear to have had the court grant the protective order or to insist upon the court granting it on an emergency basis. See Mot. Sanctions at 7. To the contrary, as the terms of the Rule make clear, the filing of the motion suffices. Amobi v. District of Columbia Dep't of Corrections, 257 F.R.D. 8, 10-11 (D.D.C. 2009).

Furthermore, this is not like the situation that concerned me in Amobi–where a party files a last-minute, frivolous motion for a protective order to evade attending a deposition. Id. at 11. To the contrary, the motions for a protective order and to strike the supplemental expert report were not frivolous. Indeed, I have granted the motion to strike, and postponed acting on the protective order until relator moves to amend her complaint. Thus, the Rule operates unequivocally to preclude the award of sanctions.

Finally, relator has preserved her right to take the 30(b)(6) deposition pursuant to the Order quoted above, which I have now signed. See Minute Order of September 21, 2010. She has not been prejudiced in any way, and she has not made her case for sanctions.

V.     **CONCLUSION**

An Order accompanies this Memorandum Opinion.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE