**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
────────────────────────────────

**UNITED STATES OF AMERICA ex**
**rel JULIE MCBRIDE,**

                    **Relator,**


            **v.**                              **1:05-CV-828**
                                                **(FJS/JMF)**

**HALLIBURTON COMPANY, KELLOGG**
**BROWN AND ROOT, also known as KBR;**
**SERVICE EMPLOYEES INTERNATIONAL;**
**KELLOGG BROWN & ROOT SERVICES,**
**INCORPORATED also known as KBRSI;**
**and KBR TECHNICAL SERVICES INC.,**

                    **Defendants.**
────────────────────────────────

**APPEARANCES**                          **OF COUNSEL**

**LAW OFFICE OF VICTOR A.**              **VICTOR A. KUBLI, ESQ.**
**KUBLI, P.C.**
13948 Bromfield Road
Germantown, Maryland 20874
Attorneys for Relator

**LAW OFFICES OF JOHN M.**               **JOHN M. FAUST, ESQ.**
**FAUST, PLLC**
1325 G Street, N.W., Suite 500
Washington, D.C. 20005
Attorneys for Defendants

**VINSON & ELKINS, LLP**                 **ALDEN L. ATKINS, ESQ.**
2200 Pennsylvania Avenue, N.W.           **CRAIG D. MARGOLIS, ESQ.**
Suite 500                                **TIRZAH S. LOLLAR, ESQ.**
Washington, D.C. 20037
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION[1]

Currently before the Court is Defendants' motion for summary judgment with respect to the first and second claims in Relator McBride's third amended complaint. *See* Dkt. No. 196.[2] The Court heard oral argument with respect to Defendants' motion on October 30, 2013, and reserved decision. The following constitutes the Court's resolution of the pending motion.

## II. BACKGROUND[3]

Under a government contract called "LOGCAP III,"[4] Defendants provided logistical services to the United States military in Iraq, performing tasks defined in contract documents called "Task Orders." Under this contract, Defendants were entitled to bill the Government for the actual costs they incurred providing those services, plus a "base fee" of one percent of a pre-negotiated "fee pool," which was an agreed estimate of what those services would cost. At the

---

[1] For ease of reference, the Court's citations to specific page numbers of documents in the record reference the page numbers that the Court's electronic filing system automatically generates.

[2] Relator McBride's third, fourth and fifth claims in her third amended complaint set forth her employment-related claims, which the Court severed from the case and stayed pending arbitration. *See* Dkt. No. 45, Memorandum Opinion dated July 5, 2007. It appears that Relator McBride never sought to arbitrate those employment-related claims. Therefore the only remaining claims in this action are her first and second claims.

[3] Throughout this decision, the Court will refer to "Defendants" collectively. However, the Court notes that it appears that Defendant Kellogg Brown & Root Services, Incorporated ("KBRSI") has been the LOGCAP III contracting entity since December 14, 2003. *See* Dkt. No. 9 n.1 (citing Ex. 3, William Walter Decl. ¶ 4). Furthermore, the only Defendant who is a party to the LOGCAP III contract is Defendant KBRSI, and Defendant KBRSI is the only Defendant that submitted bills to the Government under that contract.

[4] "LOGCAP" is an acronym for Logistics Civil Augmentation Program.

Government's discretion, Defendants could also earn a maximum of an additional two percent of the fee pool as an "award fee" for good performance as judged by various metrics set forth in the contract.

Task Order 59 was one of the first LOGCAP III Task Orders, issued in June 2003 and continuing to May 2005. It required Defendants to provide a wide range of life support services for the troops, including camp construction, power generation, dining facilities, operations and maintenance programs, potable and non-potable water services, laundry, fire protection, ice, and MWR facilities.[5] MWR facilities were a relatively small part of the overall effort, representing about 1.5% of total costs incurred and, at the two camps relevant to this case, Camps B-3, Camp Fallujah, and B-4, Ar Ramadi, less than one-tenth of one percent of total costs incurred.

Relator McBride filed this case under seal in April 2005; it was unsealed in July 2006 after the Government declined to intervene. *See* Dkt. Nos. 1, 6, 8. In October 2006, before Defendants were served with the complaint, the Defense Contract Audit Agency ("DCAA") investigated Realtor McBride's allegations, issuing written questions to Defendants and visiting Camp B-3 to review records and interview Defendants' personnel. The DCAA did not issue any formal findings. Neither DCAA nor any other agency of the Government disallowed or even challenged any of the amounts Defendants had billed for MWR services under Task Order 59.

After the Court unsealed this case, Defendants moved to dismiss. Judge Kennedy dismissed two co-relators, Mr. Meyer and Ms. Warren, and permitted just two of Relator McBride's claims to go forward to discovery: (1) her core assertion that Defendants had used false MWR head count tallies to overbill the Government and (2) her claim that Defendants had

---

[5] "MWR" is an acronym for Morale, Welfare and Recreation.

improperly requisitioned certain equipment from the Government for their own use. *See* Dkt. Nos. 45, 55.

Defendants then moved for summary judgment on the billing question, arguing that the contract documents clearly established, as a matter of law, that they did not charge the Government for MWR services on a "per head" basis. Judge Kennedy denied that motion without prejudice pending discovery. *See* Dkt. No. 67. Defendants then asked the Court to order Relator McBride to stage her discovery so that it focused in the first instance on her camp and time period and that discovery proceed to the dozens of other camps in wartime Iraq only if the initial discovery produced evidence tending to sustain her allegations. *See* Dkt. No. 72. The Court denied that motion.

For the next three years, Defendants produced pages of paper and electronic documents from their headquarters and all over Iraq. Defendants took Rule 30(b)(6) depositions of the Army in 2009 and deposed Relator McBride in 2010. Relator McBride took no fact depositions. As discovery neared a close, Relator McBride filed pretrial disclosures and an expert report that explained her "excessive staffing" theory and indicated that she would challenge Defendants' MWR reporting at only two camps, hers and B-4, Ar Ramadi, during a limited time period under Task Order 59, from July 1, 2004, to her termination on March 4, 2005. With only a few weeks left in discovery, Relator McBride tried to re-expand her case to other sites and timeframes, prompting Defendants to move for a protective order requesting that, for all discovery remaining at that point, principally, a Rule 30(b)(6) deposition of Defendants, the Court limit Relator McBride to the theory she had pled and to the narrow geographic and temporal scope she had recently announced in the case.

Both Magistrate Judge Facciola and this Court offered to provide Relator McBride with the opportunity to seek leave to file a further amended complaint to articulate her excessive staffing theory and the scope of her claims as she saw them. Relator McBride declined those offers; the Court granted Defendants' motion for a protective order; and discovery closed after Relator McBride took Defendants' Rule 30(b)(6) deposition in February 2013.

Defendants then filed the pending motion for summary judgment. *See* Dkt. No. 196. Relator McBride opposed that motion. *See* Dkt. No. 199.

## III. DISCUSSION

### A. Summary judgment standard

A court will grant summary judgment "when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Actelion Pharmaceuticals Ltd. v. Kappos*, No. 10-01145, 2013 WL 5310176, *2 (D.D.C. Sept. 23, 2013) (citing Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In addressing a motion for summary judgment, a court "will accept as true the evidence of the non-moving party, and draw 'all justifiable inferences'" in her favor. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citation omitted)). "A genuine dispute about a material fact only exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting [*Anderson*, 477 U.S.] at 248).

Once the moving party has made its initial showing, "the nonmoving party must demonstrate 'specific facts showing that there is a genuine issue for trial.'" *United States ex rel.*

*Fago v. M&T Mortg. Corp.*, 518 F. Supp. 2d 108, 113 (D.D.C. 2007) (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). If the nonmoving party produces evidence that is merely colorable, or that is not significantly probative, the court may grant summary judgment. *See id.* (quoting *Liberty Lobby*, 477 U.S. at 249-50, 106 S. Ct. 2505 (citations omitted)).

**B.      Relator McBride's theory of the case**

As one basis for their motion for summary judgment, Defendants contend that Relator McBride has abandoned the only theory of liability that survived their motion to dismiss and has waived her opportunity to proceed on an alternative theory. Specifically, Defendants assert that Relator McBride's initial theory was that Defendants had falsely overstated the number of troops who used their MWR facilities and, thus, fraudulently overcharged the Government, *see* Dkt. No. 196, Defendants' Memorandum of Law at 20, and that she has abandoned that theory in favor of a new theory that Defendants inflated their MWR head counts, not directly to overstate the costs they had incurred, but indirectly to persuade the Government to accept a level of MWR staffing that was excessive for the task at hand and to pay Defendants for incurring these unnecessary labor costs, *see id.* at 21. To the contrary, Relator McBride  argues that she is not seeking to prove her case on a theory different from the one she pled. *See* Dkt. No. 199, Relator McBride's Opposition at 26.

Defendants are correct that Relator McBride cannot discover or try a case that she has not pled. However, to determine whether she is, in fact, attempting to do so requires the Court to review both her third amended complaint and the Court's prior decisions in this case.

In its July 5, 2007 Memorandum Opinion and Order, the Court (Kennedy, J.) noted that

Relator McBride's then current and proposed second amended complaints alleged, among other things, that Defendants

> (1) billed the government for meals not served to U.S. troops at its dining ("DFAC") facilities in Fallujah; (2) sold housing containers (colloquially referred to as "hooches") at exorbitant prices to the military; (3) inflated headcounts (collected via "situation reports," commonly referred to as "Sit Reps") documenting usage of its MWR facilities in Iraq and billed the government for "costs" that were calculated based on those inflated headcounts; and (4) made requisitions for supplies for the troops and then siphoned those supplies to [Defendants'] employees.

*United States ex rel. McBride v. Halliburton Co.*, No. 05-00828, 2007 WL 1954441, *1 (July 5, 2007).

With regard to these claims, the Court found, as an initial matter, that, although "the public disclosure bar prevent[ed] her from pursuing her DFAC-related claims[,] [h]er other claims [were] not barred." *Id.* at *7 (footnote omitted).

The Court then proceeded to determine whether Relator McBride had adequately alleged presentment. *See id.* at *8. In this regard, the Court found that, although "the allegations undeniably [were] lean, [Relator McBride did] allege that KBRSI submitted false claims regarding MWR headcounts." *Id.* The Court explained that Relator McBride's "complaint state[d] that payment under LOGCAP for MWR costs was based, at least 'in significant part,' on usage, i.e., 'the number of patrons who utilize the facilities.'" *Id.* (quoting Proposed 2nd Am. Compl. ¶ 24 ("[T]he U.S. paid KBR for the MWR facilities according to usage." (footnote omitted)). The Court concluded that, "[r]ead in the light most favorable to [Relator McBride], this allegation [might] be deemed to state that Sit Rep usage statistics [were] used to calculate KBR's costs under LOGCAP. These costs [were] submitted for payment to the government." *Id.* Furthermore, the Court stated that, although Defendants made "great hay of the fact that any

inflated costs would have run (and in fact did run) the risk of a lower fee award (the amount paid over and above the cost of performance) from the government, but whether any alleged fraud regarding *costs* had an impact on [Defendants'] eventual awarded '*profit*' (a bit of a misnomer, if [Relator's] cost-calculation allegations [were] to be believed) [was] irrelevant[,]" because, if Defendants "made false statements regarding costs to get claims paid, FCA impose[d] liability." *Id.* at *8.

Nonetheless, the Court agreed with Defendants that other than Relator McBride's "MWR Sit Rep allegations, there [were] no sufficient allegations of any false claims being presented as to her myriad other claims." *Id.* at *9. Thus, the Court dismissed Relator McBride's claims "regarding overpriced housing containers, soft drinks, the Super Bowl party, siphoned requisitions,[6] gym equipment, *et cetera*[.]" *Id.* (footnote omitted).

Finally, having narrowed Relator McBride's claims to her MWR Sit Rep allegations, the Court discussed whether Relator McBride had met Rule 9(b) of the Federal Rules of Civil Procedure's particularity requirement. *See id.* In this regard, the Court found that Relator McBride's "complaint adequately identifie[d] persons involved in the preparation of the alleged false Sit Rep records, and [that] this identification [was] sufficient for purposes of subsection (a)(2) [of § 3729]." *Id.* Thus, the Court concluded that Relator McBride had alleged "a particular scheme to inflate MWR usage statistics, which statistics were then used, in part, to substantiate KBR's LOGCAP costs, which costs where then presented by third parties to the

---

[6] Relator McBride moved for reconsideration of the Court's dismissal of her "siphoning" claim. *See* Dkt. No. 48. The Court granted her motion, holding that Relator "McBride may litigate her 'siphoning' claim, but only as to siphoned MWR requisitions (in the manner specified above) during the time period when [Relator] McBride was working for SEII in Iraq." *See* Dkt. No. 55 at 2 (footnote omitted).

government for payment" and that such allegations met Rule 9(b)'s requirements.  *Id.*[7]

As a result of the Court's July 5, 2007 Memorandum Opinion and Order and its subsequent Order granting Relator McBride's motion for reconsideration, the only claims that remain in this case are Relator McBride's first and second claims, and those claims are limited to her allegations that Defendants inflated head counts, collected via Sit Reps, documenting usage of Defendants' MWR facilities and billed the government for "costs" that were calculated based, at least in part, on those inflated head counts and that Defendants siphoned MWR requisitions. Furthermore, these claims are limited to Defendants' MWR facilities at two camps – Camp B-3 (Camp Fallujah) and Camp B-4 (Camp Ar Ramadi) under Task Order 59 and to the time period between July 1, 2004, and March 4, 2005.

Specifically, in her first claim, Relator McBride alleges that "[t]he KBR entity responsible for the LogCAP III contract has billed the United States Government under that contract each month, and will continue to do so throughout the pendency of this lawsuit."  *See* Dkt. No. 86, Third Amended Complaint at ¶ 98.  Relator McBride further asserts that "[e]ach of these claims . . . is a false or fraudulent claim. . . . For instance, with each request for payment, KBR either implicitly or explicitly certified that it was complying with the terms of the LogCAP III contract task order governing Morale, Welfare and Recreation, when in fact it was not."  *See id.*  Furthermore, Relator McBride claims that "Defendants . . . knowingly caused such false and fraudulent claims to be submitted . . . [and] knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the

---

[7] Although Defendants, once again, argue that Relator McBride's claims fail because her allegations do not meet the particularity requirements of Rule 9(b), the Court agrees with Judge Kennedy's conclusion that Relator McBride's allegations have met Rule 9(b)'s requirements.

United States, false and fraudulent claims for payment or approval." *See id.* at ¶¶ 100-101.

In her second claim, Relator McBride alleges that "Defendants knowingly made, used or caused to be made or used numerous false records or statements in order to get the false or fraudulent claims paid or approved . . . . Examples of such false records include the Sit Reps . . . ." *See id.* at ¶ 103. Relator McBride further contends that "Defendants thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government." *See id.* at ¶ 104.

To support these claims, Relator McBride states that, when she worked the day shift at Camp Fallujah, her duties included coordinating and supporting all of the activities that took place in the MWR facilities in Camp Fallujah, which, among other things, included ensuring that any soldier who entered an MWR facility signed in to use it. *See* Dkt. No. 86 at ¶ 24. In February 2005, Relator McBride began to work the night shift at the MWR facility in Camp Fallujah. *See id.* at ¶ 25. This assignment included the extra duty of compiling the "head count" for reporting in the Situation Reports ("Sit Rep"),which were sent to Defendants' management. *See id.* The Sit Rep head count purported to reflect how many people had used the MWR facilities each day. *See id.* at ¶ 26. Crystal Nadeau, Relator McBride's supervisor, advised her that the United States paid Defendants for the MWR facilities according to usage. *See id.* at ¶ 27. Funding for MWR facilities and personnel was based, in significant part, either directly or indirectly, on the number of patrons who used the facilities. *See id.* The Sit Rep information was ultimately used to justify Defendants' "fee." *See id.*

Relator McBride contends that Defendants' MWR head count methodology was designed to inflate the reported number of patrons vastly. *See id.* at ¶ 28. This increased the MWR budget

in Iraq, allowing for more facilities, administrators, staff and equipment, and boosting Defendants' fee. *See id.* During Relator McBride's tenure serving in Iraq, from November 2004 until March 2005, Camp Fallujah had two buildings devoted to MWR. *See id.* at ¶ 29. The first MWR building was the Fitness Center, which had five rooms – the Weight Room, the Video Game Room, the Game Room, the "Ab" (abdominal weight training) Room, and the Theater Space, where larger activities like dances were held. *See id.* at ¶ 30. The second MWR building in Camp Fallujah was the Internet Café, which had approximately forty computers and ten phones for military personnel to use and a library. *See id.* at ¶ 31. Defendants employed approximately ten employees to staff these MWR facilities. *See id.* at ¶ 32.

When Relator McBride began to work the night shift, she became familiar with the procedures that Defendants' personnel used to report the number of MWR patrons. *See id.* at ¶ 33. Phil Martinez, an MWR Coordinator at Camp Fallujah, showed Relator McBride how to inflate these numbers for Defendants' benefit. *See id.* at ¶ 34. Every patron who entered the Fitness Center had to sign in and that signature was counted as one person using the MWR facility. *See id.* at ¶ 35. This was often referred to as the "Boots in the Door count." *See id.* In addition, any patron who then used either a computer or a phone in the Internet Café was counted again as a person using the MWR facility and added to the total number of patrons. *See id.* at ¶ 36. Furthermore, KBR instructed its Third Country National ("TCN") employees, who were non-Americans and non-Iraqis imported into Iraq, to take an hourly count of people using each room in the Fitness Center, as well as the library of the Internet Café, and these hourly totals are added to the head count. *See id.* at ¶ 37. In addition, military personnel who signed in to participate in a particular activity, such as a chess tournament, were always counted

again, and this number was added to the head count. *See id.* at ¶ 38. Sometimes the number of equipment items that the troops checked out, such as ping-pong sets, were included in the head count. *See id.* There were also occasions when the number of towels dispensed to the troops were included in the head count. *See id.* At other times, the number of water bottles that the troops used were counted in the head count. *See id.*

Based on these allegations, Relator McBride claims that it was very likely that one patron using the MWR facilities would be counted several times. *See id.* at ¶ 39. For example, a patron waiting in the Internet Café for an hour and a half to use a computer could be counted once upon initially signing into the MWR facility and then twice more at the beginning of each hour while he or she was waiting. *See id.* Moreover, Relator McBride argues that the inflated numbers were even more pronounced in the Fitness Center, which contained five separate rooms. *See id.* at ¶ 40. A patron using that MWR facility who signed in to use the Fitness Center and then worked out in the Ab Room for a couple of hours was counted at least three times – once when signing in and twice when the hourly count was conducted. *See id.*

Relator McBride asserts that Ms. Nadeau sent the compiled Sit Rep head counts each day via e-mail to Camp B-1 at Al Asad, where Defendants' management was located. *See id.* at ¶ 45. Relator McBride further contends that, by inflating the number of MWR users, Defendants' rationalized a greater need for facilities, equipment, staffing and administrators than actually existed. *See id.* at ¶ 47. Finally, Relator McBride claims that, under the LOGCAP III contract, the more facilities, equipment, staff and administrators Defendants could depict a need for, the more profit Defendants made. *See id.*

Based on its review of the allegations contained in Relator McBride's first and second

claims in light of the Court's July 5, 2007 Memorandum Opinion and Order and the Court's

subsequent orders in this case, the Court concludes that Relator McBride is not attempting to try

this case under a new theory. Although the allegations in Relator McBride's third amended

complaint are open to different interpretations, at their core, her first and second claims are based

on her contention that Defendants inflated the head count of patrons using the MWR facilities at

Camps B-3 and B-4 during the period between July 1, 2004, and March 4, 2005, collected these

inflated head counts via Sit Reps, and used these Sit Rep head counts as part of their

methodology for reporting their costs, including their staffing costs, to the Government to get

their claims paid.

Therefore, to the extent that Defendants base their motion for summary judgment on their

contention that Relator McBride has abandoned her initial theory of liability and is attempting to

rely on a new theory of liability, the Court denies their motion.[8]


**C.    The materiality of Defendants' MWR head counts**

Defendants contend that, even if Relator McBride could prove that Defendants' head

count tallies were false, her claims would still fail because MWR head counts were not material

to what Defendants earned from the Government for providing MWR services under Task Order

59. *See* Dkt. No. 196 at 26-27 (footnotes omitted). Furthermore, Defendants claim that the

---

[8] To be perfectly clear, Relator McBride's first and second claims are limited to her
contentions that Defendants inflated the head count of patrons using the MWR facilities at
Camps B-3 and B-4 during the period between July 1, 2004, and March 4, 2005, collected these
inflated head counts via Sit Reps, and used these Sit Rep head counts as part of their
methodology for reporting their costs, including their staffing costs, to the Government to get
their claims paid.

Government, on whose behalf Relator McBride sues, by its actions and its testimony in this case, has made clear that MWR head counts played no role in its decision whether or how much to pay Defendants for MWR services. *See id.* at 27.

To support their position, Defendants note that DCAA reviews all costs submitted for reimbursement under a cost-plus-award-fee contract such as LOGCAP III, in order to evaluate the allowability of those costs under the Federal Acquisition Regulation ("FAR"). *See id.* (citing Ex. 2 ¶ 23). In September 2006, DCAA sent Defendants a set of questions relating to allegations Relator McBride had made in testimony that she had given before the Senate Democratic Policy Committee. *See id.* (citing Stmt. ¶ 40). DCAA told Defendants that it was treating the allegations as a potential audit lead concerning contract costs and said it hoped to obtain from Defendants documentation "necessary to determine materiality." *See id.* (citing [Ex. 2 ¶ 23]; Ex. 32, Email from Sylvia Wofford, DCAA (Sept. 21, 2006) (KBR-MCB-2047230)). Defendants responded to DCAA's inquiries in October 2006. *See id.* at 28 (citing Stmt. ¶ 40).

As part of its review of Relator McBride's allegations, DCAA representatives visited Camp B-3, Fallujah, MWR facilities in November 2006. *See id.* (citing [Stmt. ¶ 40]). The DCAA representatives toured the MWR facilities, questioned Defendants' MWR representatives, reviewed Defendants' MWR sign-in sheets, and took photographs. *See id.* (citing [Stmt. ¶ 40]).

Defendants argue that, given that DCAA's goal was to determine the materiality of Defendants' MWR head counts to government invoices, its non-action reflects a conclusion that they were not material. *See* Dkt. No. 196 at 28. Furthermore, Defendants assert that the Government's informed decision not to impose or seek any sort of billing adjustment for allegedly "false" head count reports undermines any assertion that Defendants knowingly set out

to defraud the Government. *See id.* (citations omitted).

Alternatively, Defendants argue that MWR head counts were irrelevant to what they billed for and what the Government decided to pay. *See id.* at 29. When the Government directed Defendants to begin performing under Task Order 59 in June 2003, Defendants did not and could not estimate their MWR costs with any MWR usage data because they had no Iraq-specific experience that they could have used for that purpose. *See id.* (citing Stmt. ¶ 26). Instead, Defendants relied on experience gained in other countries and on general guides such as the "Sand Book," which is specified as a reference in Task Order 59, to prepare cost estimates based principally on anticipated camp population and a functional analysis of the size, open hours, and other characteristics of the MWR facilities expected to be available, as well as the programs to be offered in each facility. *See id.* (citing Stmt. ¶¶ 26-28). Furthermore, Defendants claim that, even if there had been MWR usage data available, there was no recognized metric equating MWR usage with any particular level of staffing needed to operate a given MWR facility in Iraq. *See id.* at 29-30 (citing [Stmt.] ¶ 28). The military, not Defendants, ultimately decided on the level of MWR services and staffing to be provided. *See id.* at 30 (citing Ex. 6 at 24-25 ("The contractor doesn't decide the scope of services."), 88-91 (Q: "[D]oes that mean that the number of [KBR MWR] staff is driven by the services that the base commander and [administrative contracting officer] decide that they want? A: "Yes."); Ex. 14 at 19-23; Ex. 7, Valiant DuHart Dep. 47-48 (Dec. 2, 2009) ("Q: So would it be fair to say that the contractor is following instructions of the base commander and the ACO about the level of services at a particular site? A: Correct.")).

In addition, Defendants state that Government witnesses confirmed that Defendants were

not required to provide MWR headcounts to the Government and that those headcounts, which Defendants provided to the Government on a voluntary basis, had no impact on Defendants' billings whatsoever. *See id.* (Stmt. ¶¶ 17, 32-33, 35-36, 38) (footnote omitted). Defendants also note that, although they did prepare daily event situation reports that were required deliverables, these Sit Reps simply reported Defendants' progress toward setting up the various Task Order 59 services required around Iraq; they were not required to, and did not, include MWR head counts. *See id.* n.19 (citing Stmt. ¶ 34). Defendants claim that they provided their MWR head count reporting separately to the Government, voluntarily, as one small part of a lengthy monthly report containing quantitative data, not just for MWR, but for all of the services they were providing, including transportation, laundry, food service, water services, and trash collection. *See id.* (citing [Stmt.] ¶ 33; Ex. 18, 2004 Master LOGREP (KBR-MCB-1704418)).

Furthermore, Defendants point out that both Valiant DuHart, the Government's Procuring Contracting Officer ("PCO") for Task Order 59, and Kristan Mendoza, the Chief of the LOGCAP Contracting Division, who testified as Rule 30(b)(6) witnesses on behalf of the Army Sustainment Command ("ASC"), stated that MWR head counts were irrelevant to the amount Defendants were paid. *See id.* at 30 (citing Ex. 7 at 13-14, 34-35; Ex. 6 at 10, 33, 53). Ms. Mendoza explained that "there is no minimum number of [MWR] patrons that are required to be served in MWR named in the [LOGCAP] contract, so [MWR head counts] really [don't] have any . . . significance in terms of contract compliance. We call these kind of *gee-whiz numbers*." *See id.* at 30-31 (citing Ex. 6 at 126-27 (emphasis added)). Ms. Mendoza also confirmed that the Government paid Defendants based on the costs they incurred to provide services and not based on head counts. *See id.* (citing [Ex. 6] at 78-79, 162-65 (testifying that ASC information paper

prepared for senior Army official Tina Ballard correctly stated that "LOGCAP is a cost-reimbursable contract, and the contractor is compensated for costs incurred rather than headcount at MWR facilities.")). Furthermore, Defendants argue that, even if they had inflated their head count numbers, that would not have increased the amount that they were reimbursed under the contract. *See id.* (citing Stmt. ¶ 36). Finally, Defendants state that Mr. DuHart testified that the Government did not use MWR head counts for any purpose whatsoever. *See id.* (citing Ex. 7 at 64). In fact, he was not even aware that ASC had received such data from Defendants. *See id.* (citing [Ex. 7] at 54-55).

Defendants further argue that declarations from Jerry Conry, a Defense Contract Management Agency ("DCMA") Administrative Contracting Officer, and Charles Smith, former Army Division Chief, Field Support Contracting, are consistent with ASC testimony. *See id.* at 31 (citing Ex. 9 ¶2; Ex. 17, Charles Smith Supp. Decl. ¶ 8). According to Defendants, Mr. Conry's role was to determine whether costs that contractors, including them, submitted were allowable, allocable and reasonable. *See id.* (citing Ex. 9 ¶ 9; FAR § 31.201-2). Mr. Conry stated that Defendants' bills were based on the actual costs incurred, such as labor, equipment and facility costs, rather than on the number of MWR users. *See id.* (citing Ex. 9 ¶ 6). Mr. Conry also stated that, at no time, did he rely on the number of MWR facility users as a factor in determining the allowability, allocability, or reasonableness of Defendants' claimed MWR costs, nor was he aware of any other Government contracting professional doing so. *See id.* (citing [Ex. 9] ¶ 4). Likewise, Mr. Smith stated that he did "not recall receiving MWR usage information or discussing [it] with . . . [Defendants], the [ASC], the DCMA, [DCAA] or [with] any other government official." *See id.* (citing Ex. 17 ¶ 8).

Furthermore, Defendants state that talking points prepared for a senior Army official to address congressional inquiries about Relator McBride's congressional testimony emphasized that "MWR size, capacity, and types of services are determined by base camp populations as provided by the Base Commander." *See id.* at 32 (citing Ex. 10, Army Sustainment Command White Paper (MCB-ASC-001843)). Defendants argue that these talking points confirm that Defendants were "compensated for costs incurred rather than head-count at MWR facilities." *See id.* (citing [Ex. 10]). The testimony of William Walter, a former DCAA auditor and Defendants' former Senior Vice President of Government Compliance, and Steven Grady, a former Theater MWR Manager for Defendants also confirm that Defendants billed the Government for actual costs incurred in providing MWR services, not based on headcount. *See id.* (citing Ex. 3 ¶¶ 2-3, 18; Ex. 2 ¶ 2; Ex. 11 ¶ 10). Head counts at MWR facilities had no relationship to or impact on Defendants' invoices to the Government, and the personnel and systems used to track usage were entirely distinct from those employed to account for and bill MWR costs. *See id.* (citing Stmt. ¶ 16). In fact, Defendants contend that their accounting and billing systems did not accept head counts and could not convert head counts to costs even if the people running that system had had access to MWR head count reports, which they did not. *See id.* (citing [Stmt. ¶ 16]). MWR Manager Grady stated that "nothing of particular significance turned on those [MWR head count] numbers, including [Defendants'] award fees." *See id.* (citing Ex. 11 ¶ 10). Rather, Defendants were "paid by the Government for [their] MWR services according to the labor and other costs [they] incur[] performing that function, not by the number of patrons who come through the MWR facilities each day." *See id.* (citing [Ex. 11] ¶ 10).

Defendants also argue that MWR head counts were not material to the Government's determination of what award fees Defendants would receive for their performance under Task Order 59. *See id.* at 33. Defendants were entitled to earn up to 2% of the negotiated estimated costs of Task Order 59 (sometimes referred to as the "fee pool"), and the Government determined this award fee through an evaluation process according to a set of performance criteria laid out in the LOGCAP III contract. *See id.* (citing Stmt. ¶¶ 18-20). The award fee criteria included the following: technical performance (30%), cost performance (40%), and management (30%). *See id.* (citing [Stmt.] ¶ 23). Thus, MWR head counts were not a contractually relevant award fee factor. *See id.* (citing [Stmt.] ¶ 24).

Defendants' employee, William Walter, attended the award fee evaluation board for the work in Iraq under Task Order 59. *See id.* (citing Ex. 2 ¶¶ 12-13). He confirmed that the Task Order 59 MWR costs made up an "insignificant percentage of the total costs incurred under that Task Order for the period of performance at issue." *See id.* (citing [Ex. 2] ¶¶ 13, 15). He recalled no discussion at the Task Order 59 award fee board proceedings about MWR patronage or staffing and has no reason to believe that these issues affected the award fee evaluation board's determination. *See id.* at 33-34 (citing [Ex. 2] ¶ 13). Furthermore, Army Rule 30(b)(6) witnesses DuHart and Mendoza testified that MWR head counts had no impact on the award fees awarded to Defendants. *See id.* at 34 (citing Ex. 7 at 65-66 (discussing Ex. 25, "Magnitude of Effort" slide, at KBR-MCB-1909588); Ex. 6 at 161 (Q: "[I]s there any way that inflating headcounts would increase the amount of money that [Defendants are] paid?" A: "The headcounts didn't have any bearing . . . on the award fee, and they did not have any bearing on the incurred costs.")) (footnote omitted). Defendants contend that not one of their award fee

board letters for Task Order 59 discussed MWR services. *See id.* Ms. Mendoza testified that, if MWR had influenced an award fee determination either positively or negatively, it would have been mentioned in the letters. *See id.* (citing Ex. 6 at 137-38, 145, 154-57 (discussing Exs. 12, 13 (award fee letters))).

In response to Defendants' arguments, Relator McBride contends that falsity is "material" if it has "'a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property.'" *See* Dkt. No. 199 at 27 (quoting FCA § 3729(b)(4)). She asserts that Defendants posit an untenable proposition, i.e., that, in the context of a cost-plus contract where as a matter of law and the contract the payments are based on the amount of work performed, inflating the amount of work performed has no "tendency to influence" and is "[in]capable of influencing" any payments. *See id.*

Furthermore, Relator McBride argues that LOGCAP III incorporates FAR 52.216-7, which permits reimbursement of allowable costs only. *See id.* (citing FAR 52.216-7(a)(1) (2000) ("The Government shall make payments to the Contractor . . . in amounts determined to be allowable by the Contracting Officer in accordance with Subpart 31.2 of the Federal Acquisition Regulation (FAR) . . . ."). Costs are allowable pursuant to FAR subpart 31.2 if they meet the standard of reasonableness. *See id.* at 27-28 (citing FAR 31.201-2 (2000) ("The factors to be considered in determining whether a cost is allowable include the following: (1) Reasonableness."). Furthermore, "'[n]o presumption of reasonableness shall be attached to the incurrence of costs by a contractor. . . . [T]he burden of proof shall be upon the contractor to establish that such cost is reasonable.'" *See id.* at 28 (quoting FAR 31.201-3(a)). According to Relator McBride, that is why LOGCAP III, the FAR, and separately the United States

Department of Justice ordered Defendants to preserve their records.  *See id.*  Realtor McBride

contends that Defendants have never offered an explanation for why they violated those orders

en masse with respect to their MWR head count sign-in sheets throughout Iraq.  *See id.*  The only

explanation in the record is the one that Relator McBride and Ms. Warren, her co-worker, related

– that Defendants intentionally trashed the MWR sign in sheets.  *See id.* at 28-29 (citing Dkt. No.

33-3 (Decl. of Linda Warren (Feb. 14, 2007)), at ¶ 8[;] Rel. Ex. 25 [McBride Dep. at 189]).

Relator McBride states that this practice ended at Camp B-3 when she protested.  *See id.* at 29

(footnote omitted).

     Furthermore, Relator McBride asserts that, as a matter of law and the LOGCAP III

contract, inflation of the amount of work performed is material because payments were based on,

i.e., were reasonable, only in relation to the amount of work performed.  *See id.*  Relator

McBride also points to Relator Exhibit 14, Defendants' MWR Regional Manager's statement that

"'I can't express how important'" their MWR headcount figures were in order for Defendants to

get the credit they deserved.  *See id.* (quoting Rel. Ex. 14).  Furthermore, in Relator's Exhibit 6,

Defendants state as follows in an internal manual on SITREP and Logistics Report training:

> We count the number of people that signed in from 0001 until
> 2355 on that day.  We need to have the same some [sic] of people
> matching the number we are reporting.  Reporting any other
> [MWR headcount tally] number not matching the actual records
> will be **FRAUD**.

*See id.* (citing Rel. Ex. 6 [KBR_MCBE 000007020]).

     Also, in Relator's Exhibit 34, the LOGCAP III Administrative Contracting Officer attests

that,

> "[i]f the contractor created and then maintained or supplied to
> DCMA false, inflated tallies of MWR visitors and I became aware
> of the false nature of the tally or tallies, such discovery might have

> influenced me to undertake further review in order to ascertain
> whether all of the claimed costs were reasonable and allowable;
> and based on such inquiry, I might have concluded that some of
> the charged costs were unallowable."

*See id.* (quoting Rel. Ex. 34 ¶ 8).

Furthermore, Relator McBride contends that, in Relator Exhibits 15 and 16, Defendants made presentations to the award fee board that lauded the numbers of MWR patrons served in order to boost their chances of winning the highest possible discretionary award fee. *See id.* at 30. Defendants also submitted Basis of Estimate and Logistics Reports to the Government in which they reported the supposed number of MWR patrons. *See id.* (citing Ex. 6 to Dkt. No. 111 ("Basis of Estimate" report); Rel Ex. 1 (same); Rel. Exs. 2-3 (later LOGCAP III contract requirements); Rel. Ex. 11 (example of Logistics Report transmission to Government and others); Rel. Ex. 6 (Defendant manual on preparation of SITREP and Logistics Reports that explains that "Reporting any other [MSR headcount tally] number not matching the actual records will be **FRAUD**")) (footnote omitted).

Finally, Relator McBride argues that the fact that the Government declined to act separately to address the issue is immaterial. *See id.* n.4 (citations omitted). Relator McBride contends that the other record material on which Defendants rely consists of generalized statements and assertions that stop short of suggesting that Defendants were entitled to create and submit inflated MWR facility usage data and that such false data is incapable of influencing payments. *See id.*

The False Claims Act ("FCA") provides, in pertinent part, that

> (1) any person who –

> (A) knowingly presents, or causes to be presented a false or

fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false
record or statement material to a false or fraudulent claim . . .

\* \* \* \* \* \* \* \* \* \*

is liable to the United States Government for a civil penalty of not
less than $5,000 and not more than $10,000, as adjusted by the
Federal Civil Penalties Inflation Adjustment Act of 1990 (28
U.S.C. 2461 . . .), plus 3 times the amount of damages which the
Government sustains because of the act of that person. . . .

31 U.S.C. § 3729(a)(1).

In other words, the FCA penalizes the presentation of a "false or fraudulent clam for

payment" or the use of "a false record or statement material to a false or fraudulent claim[.]"  31

U.S.C. § 3729(a)(1).  For purposes of the FCA, "'[a] false statement is material if it "has a natural

tendency to influence agency action or is capable of influencing agency action."'"  *United States*

*ex rel. Fago v. M&T Mortgage. Corp.*, 518 F. Supp. 2d 108, 118 (D.D.C. 2007) (quotation and

other citation omitted).

For purposes of determining the materiality of the MWR head counts, the issue is not

whether these MWR head counts resulted in the Government ultimately paying Defendants more

than it should have for the MWR services they provided,[9] as Defendants appear to suggest.

_____

[9] The Court notes, however, that what effect, if any, the MWR head counts had on the
amount that the Government ultimately paid Defendants for providing MWR services is relevant
to the issue of damages.  This is because the FCA imposes two types of liability.  "First the
submitter of a 'false claim' or 'statement' is liable for a civil penalty, regardless of whether the
submission of the claim actually causes the government any damages; even if the claim is
rejected, its very submission is a basis for liability."  *United States ex rel. Schwedt v. Planning
Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995).  "Second, the submitter of the claim is liable
for damages that the government sustains because of the submission of the false claim."  *Id.*  "To
recover for these damages, Plaintiff must prove causation – specifically that the Defendant
caused the Government to pay claims 'because of' the alleged false statements."  *United States ex*
(continued...)

Rather, the issue is whether Defendants knowingly submitted false, i.e., inflated, MWR head counts to the Government to support their claims for costs that they had incurred with respect to the MWR services they provided. With this distinction in mind, the Court finds that Relator McBride has come forward with sufficient evidence to create a material issue of fact regarding the materiality of Defendants' MWR head counts. In other words, based on the record before the Court, and drawing all reasonable inferences in Relator McBride's favor, the Court cannot conclude, as a matter of law, that these alleged false MWR head counts were not capable of influencing the amount that the Government ultimately paid to Defendants for the MWR services that they performed in Camps B-3 and B-4 for the period between July 1, 2004, and March 4, 2005, under Task Order 59.

Therefore, for the above-stated reasons, the Court denies Defendants' motion for summary judgment with regard to Relator McBride's first and second claims insofar as those claims are based on her allegations that Defendants inflated the head count of patrons using the MWR facilities at Camps B-3 and B-4 during the period between July 1, 2004, and March 4, 2005, collected these inflated head counts via Sit Reps, and used these Sit Rep head counts as part of their methodology for reporting their costs, including their staffing costs, to the Government to get their claims paid.

D.    **Relator McBride's siphoning claim**

Defendants note that Relator McBride appears to have retreated from her allegations that

---

[9](...continued)
*rel. Fago*, 518 F. Supp. 2d at 120 (citations omitted).

Defendants improperly siphoned MWR equipment, food, or building and construction supplies for their own use. Instead, Defendants contend that Relator McBride's expert only addresses one item – a large screen TV valued at $910. *See* Dkt. No. 196 at 39 (citing Ex. 8, Trivedi Report ¶ 26(e); Ex. 35, Trivedi Reply Report ¶ 10). Furthermore, at her deposition, Relator McBride admitted that her one-time putative co-relators, Ms. Warren and Mr. Mayer, provided the specific allegations about building and construction materials and that she knew little about them. *See id.* (citing Ex. 26 at 339-40 (discussing TAC ¶¶ 59-61)). Mr. Mayer, however, did not discuss these allegations in the declaration he submitted in 2007. *See id.* (citing Mayer Decl. [Dkt. 33-3]). Ms. Warren stated in her declaration that she saw "flack vest supports" made from construction materials and furniture made by TCNs but did not claim that their construction or use was fraudulent. *See id.* (citing Warren Decl. ¶ 9 [Dkt. 33-2]).

Defendants contend that, rebutting Relator McBride's unsupported allegations, the evidence is clear that Defendants' costs for housing, offices, and food for their personnel were allowable expenses under the LOGCAP III contract. *See id.* (citing Stmt. ¶ 42). Defendants' personnel were permitted to use the MWR facilities under the LOGCAP III Iraq Task Orders. *See id.* (citing Ex. 7 at 25-27; Stmt. ¶ 42). In particular, Defendants' costs associated with furniture for housing and building and supplying equipment for the offices in Iraq were reimbursable. *See id.* (Stmt. ¶ 42). Furthermore, Defendants contend that Mr. DuHart testified that, in his view as the Government's contracting officer, it would be permissible under LOGCAP for Defendants to use lumber to build coat racks for body armor or flak vests, place an extra TV in their administrative offices, and put extra exercise equipment in a tent near their main camp. *See id.* (citing [Stmt.] ¶ 43).

Finally, Defendants argue that all of Relator McBride's siphoning allegations are based on a demonstrably false premise – that Defendants were not permitted to be reimbursed for the costs of providing basic support services to their own personnel. *See id.* at 32. Defendants assert that, in fact, the contract and ASC testimony make clear that the opposite was true; Defendants were permitted to provide MWR services, food, housing and offices for their personnel and the costs of doing so were properly charged to and reimbursed by the Government. *See id.*

In response, Relator McBride points only to paragraph 35 of her January 30, 2007 Declaration in Opposition to Defendants' motion to dismiss, in which she stated as follows:

> 35. Throughout my time . . . while stationed at Camp Fallujah, I learned of [Defendants'] standard practice of using MWR requisitions for [their] own material for [their] own personal uses, rather than for the troops. For instance, a big screen TV that was ordered through MWR accounts for placement at the MWR Fitness Center in Camp Fallujah for use by the troops instead ended up in the administrative offices at [Defendants'] Camp in Al-Asad for use by [Defendants'] personnel, such as Crystal Nadeau, Kevin Clarke, Brian Huggins and Mike August. Nadeau used television access as a bargaining chip with firefighters, in exchange for them lifting heavy articles for her. In addition, weight machines that were designated for use by the troops and listed on the KBR MWR property list were instead taken to [Defendants'] Camp and placed in a tent for use by [Defendants'] employees. Food that was ordered through MWR requisitions for consumption by U.S. military troops was siphoned by [Defendants'] employees. [Defendants] routinely used requisitions to obtain food and drinks for their employees at taxpayer expense.

*See* Dkt. 33-1 at ¶ 35.

This statement, without more, is insufficient to withstand Defendants' motion for summary judgment. Even if this allegation is true, Relator McBride does not rebut Defendants' assertion that such expenses were allowable under the LOGCAP III contract; nor has she come forward with any evidence to demonstrate that these were not legitimate costs or that Defendants

submitted any false claims or any false statements regarding these items or that their personnel used these items. Thus, there is nothing in the record to indicate that the requisitioning of these items for Defendants' employees' use was a false claim within the meaning of the FCA.

Accordingly, the Court grants Defendants' motion with respect to Relator McBride's siphoning claim.


## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions and oral arguments, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED.**

Dated: May 27, 2014
      Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge