# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* Julie McBride, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. 1:05-CV-828 (FJS/JMF) |
| | ) | |
| HALLIBURTON COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## RELATOR'S RULE 59(e) MOTION TO ALTER OR AMEND JUDGMENT

Relator Julie McBride, through her undersigned counsel, respectfully files this Motion to Alter or Amend Judgment pursuant to Federal Rule of Civil Procedure 59(e). This Motion is warranted in order to correct clear error in the Court's December 10, 2014 Memorandum Opinion and Judgment (the "Opinion").[1]

## INTRODUCTION

At the last hearing, the Court asked counsel two essential questions going to the nature of the claim here and the evidence developed to date in support of that claim. Briefly put, the correct answers to these questions are:

- The violations of False Claims Act ("FCA") 31 U.S.C. § 3729(a)(1) (2008) (First Claim) are the Defendant's cost claim vouchers that withheld information about Defendant's violation of regulations and contract terms that precondition payment on compliance with

---

[1] Under Federal Rule of Civil Procedure 59(e), "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."

those provisions; and, separately, that were material to the Government's decision on whether to allow those claimed costs;

- The violations of FCA § 3729(a)(2) (Second Claim) are the records containing inflated MWR headcounts which Defendant was required to maintain or submit in order to justify its claimed costs; and

- Failure to apply the clear FCA law of this Circuit to the circumstances presented by McBride would create a gaping exception to the text and policy of the statute and the reimbursement regimen established for cost-plus contracts like the LogCAP III contract in issue here.

As we demonstrate below, under this Court's denomination of the scope of the case, Ms. McBride has presented sufficient evidence for a trial to go forward as earlier ordered by the Court. Ms. McBride regrets any failure on her part to have previously made these points sufficiently clear.

## BACKGROUND

Relator's Third Amended Complaint alleges False Claims Act ("FCA") violations under the LOGCAP III contract and Task Orders 59 and 89. Dkt. No. 86 (Third Am. Compl. ¶¶ 7, 50). As the Court recognized early on, these allegations arise in the context of a cost-plus type contract – meaning that the issue is not whether the Defendant billed its MWR headcount to the Government. McBride instead alleges a "scheme to inflate MWR usage statistics, which statistics were then used, in part, to substantiate KBR's LOGCAP costs, which costs were then presented by third parties to the government for payment." Dkt. No. 45 at 21.

With regard to Defendant's payment vouchers (the subject of her First Claim), McBride asserts that "'[e]ach of these claims . . . is a false or fraudulent claim. . . . For instance, with each

2

request for payment, KBR either implicitly or explicitly certified that it was complying with the terms of the LogCAP III contract task order governing Morale, Welfare and Recreation, when in fact it was not.'"  Op. at 8 (citing Dkt. No. 86, Third Amend. Compl. ¶ 98).  Those "terms" include federal regulations and contract provisions that establish a cost-plus contract reimbursement regimen that establishes two basic conditions for payment:  (1) the contractor may bill the Government only for costs that are "reasonable," "allocable," and therefore "allowable"; and (2) the contractor must maintain records and supporting documentation to enable the Government to assess these allowability factors for itself.  *See* May 27, 2014 Mem. Op. at 20-21 (discussion and citations therein); Dkt. No. 173 at 7-8 (discussion and citations therein); Dkt. No. 179 at 3-7 (discussion and citations therein); *e.g.*, Federal Acquisition Regulation ("FAR") 31.201-2(d) (requiring retention of records that demonstrate that costs are reasonable, and providing that inadequately supported costs may be disallowed).[2]  Here, the requirement to maintain supporting documentation was underscored by an unusual U.S. Department of Justice ("DOJ") Preservation Order directed specifically to the Defendant.  *See* Def.'s Opp'n to Mot. for Adverse Inferences Ex. G (Preservation Order).

McBride also alleges that in purporting to comply with the above requirements, the "'Defendants knowingly made, used or caused to be made or used numerous false records or statements in order to get the false or fraudulent claims paid or approved . . . .  Examples of such false records include the Sit Reps . . . ."  Op. at 8 (citing Third Am. Compl. ¶ 103).[3]  "Relator McBride further contended that 'Defendants thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United

---

[2]  It is the Government, and not the contractor, who determines allowability.  FAR 52.216-7(a)(1).

[3]  As noted below and in earlier briefs, Sitreps in the record contain MWR headcounts.

States Government.'"  *See* Op. at 8 (citing Third Am. Compl. ¶ 104).  Specifically, Relator alleges that the Defendant employed a headcount methodology under the LogCAP III contract that intentionally inflated MWR usage data to boost cost structure and justify higher fees.  Third Am. Compl. ¶ 28.  The methodology is set forth in a detailed internal document.  McBride alleges, and she and another witness detail this in declarations, that Defendant destroyed underlying MWR sign-in sheets to hide the falsity of the headcounts reported in Sitreps.  May 27, 2014 Mem. Op. at 21; Third Am. Compl. ¶ 44.

The Court permitted discovery coextensive with these allegations and the scope of LogCAP III and the task orders, and overruled the Defendant's objection seeking staged, camp-by-camp discovery.  As a result of discovery, McBride has documented (1) vastly inflated MWR headcounts, and (2) widespread destruction of supporting documentation of MWR headcounts.  *See* Dkt. No. 199 at 13-25.  In addition to the inflation of headcounts at Camp Fallujah, and evidence of inflation at other camps, *id*.,[4] discovery has revealed pervasive gaps in MWR usage records at many sites.  *E.g.*, *id*. Ex. 20 (chart of missing sign-in sheets).  This flagrant violation of the contract's record-retention provisions and the DOJ Preservation Order is consistent with McBride and Warren declarations describing the Defendant's practice of destroying the sign-in sheets (which hides the falsity of the MWR usage numbers in Sitreps).  *See* May 27, 2014 Mem.

---

[4]  The Opinion challenges the evidence of headcount inflation.  Op. at 15-16.  In fact, actual sign-in sheets and Sitreps for the same days are in the record.  Dkt. No. 199 Exs. 28-33.  These include one day (Feb. 27, 2005) on which Ms. McBride refused to submit a Sitep reporting a headcount of substantially more than double the actual and created an accurate Sitrep -- as underscored by the two actual Sitreps now in the record.  *Id*. Ex. 27.  The methodology applied to show the inflation is that prescribed by Defendant's own internal instruction.  Early in the case, Relator also supplied declarations from herself and two other witnesses who described the inflation based on their first-hand knowledge.  Finally, no explanation has been offered as to why the headcounts dropped precipitously immediately after Ms. McBride refused to continue to inflate them and instead reported them.

Op. at 21.  Defendant's Fed. R. Civ. P. 30(b)(6) witness testified that the Defendant has no explanation of the circumstances or timing of its destruction of this supporting documentation.

Discovery also has revealed that:

- LogCAP III required Sitreps, Dkt. No. 199 Ex. 3 at 7, and Sitreps reported MWR usage data, *e.g.*, *id.* Ex. 4;

- Defendant provided MWR usage data in monthly and yearly Logistics Reports required by the LogCAP III contract, *e.g.*, *id.* Exs. 5, 10-11;

- Defendant used MWR usage data in Basis of Estimate reports to the Government to establish its reasonable costs for upcoming periods, *id.* Ex. 1 (Task Order 89);

- Defendant's internal manual on the LogCAP III methodology for reporting MWR headcounts in Sitreps warns that "Reporting any other [MWR headcount tally] number not matching the actual records will be **FRAUD,"** *see* May 27, 2014 Mem. Op. at 21 (citing Rel. Ex. 6 [KBR_MCBE 000007020] [emphasis in original]);

- Defendants' MWR <u>Regional Manager</u>'s stated that she "'can't express how important'" Defendant's MWR headcount figures were in order for Defendants to "get the credit we deserve," *id.* (quoting Rel. Ex. 14);

- Defendant used MWR usage data in presentations to the Government seeking higher incentive award fee awards, *id.* at 22 (citing Relator Exs. 15 and 6);

- if the LogCAP III Administrative Contracting Officer (Mr. Conry) had known that the Defendant was maintain or supplying inflated MWR usage records, such knowledge might have affected his decision as to whether Defendant's claimed MWR costs were reasonable and allowable, *id.* at 22 (citing Relator Ex. 34); and

- Revealingly, Defendant's MWR headcounts dropped precipitously immediately after Ms. McBride refused to participate in the inflation scheme and reported it to her supervisors. *See* Dkt. 199 at 17 ("Anatomy of a Fraud").

After discovery was substantially complete, the Court limited the scope of the case to sites B-3 and C-2, and invited Relator to further amend her Complaint to plead other camps. Instead of amending, Relator rested on her position that the Third Amended Complaint already covered other camps; and that the parties actually had been conducting discovery of sign-in sheets at other camps precisely because the Court already had recognized that such discovery is relevant to the allegations in the Third Amended Complaint; that the allegations concerned a discrete contract, discrete task order, and a discrete internal headcount methodology.

The Court is familiar with much of the evidence, and the arguments towards or against its relevance or weight.[5]  This Motion is not intended to rehash these arguments.  As noted above, this Motion respectfully is intended to correct clear error in the manner in which the Opinion applies the law of this Circuit to the evidence.  *See, e.g.*, *Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam) (judgments may be reconsidered under Rule 59(e) based on "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.").

---

[5]  To take one example, Defendant points out that a Basis of Estimate report relates to task order 89 and not 59.  Dkt. No. 199 Ex. 1.  But reimbursement regimen is set forth in the FAR and the LogCAP III contract and does not change with new task orders.  Hence not only the Government but the Defendant itself viewed MWR headcounts as material to reimbursement under LogCAP III.  Defendant's argument therefore, at best, goes to the weight of this evidence and not its relevance.

6

**DISCUSSION**

The Opinion discusses the law of this Circuit on the elements of a violation of Section 3729(a)(1) and legal (or implicit) falsity in particular (First Claim), and Section 3729(a)(2) (Second Claim).  However in applying this law to the evidence, the Opinion strays from these elements and blurs the distinctions between Sections 3729(a)(1) and 3729(a)(2).  As a result, the Opinion disregards the clear relevance of certain evidence while crediting immaterial evidence as relevant.  As discussed below, a correct application of the FCA and the law of this Circuit demonstrates that there is abundant evidence to prove the challenged elements of Relator's claims under Sections 3729(a)(1) and 3729(a)(2).

I.   False Claims Under Section 3729(a)(1).

   a.   The Law.

"As the False Claims Act existed at the time of the conduct giving rise to this action, it imposed liability on any person who . . . knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval[.]"  FCA § 3729(a)(1) (2008).  Op. at 8.

The Opinion acknowledges the distinction between factually false claims and legally false claims and the D.C. Circuit's decision on this subject in *United States v. Science Applications International Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010).  In *SAIC*, the United States alleged that the defendant violated Section 3729(a)(1) by submitted claims without revealing that it was violating a contract provision against conflicts of interest.  The issue was "whether an FCA plaintiff may state a cause of action against a federal contractor who fails to disclose the violation of a contractual condition that is material to the government's decision to

7

pay where, as here, that condition is not an express prerequisite to payment." *SAIC*, 626 F.3d at 1267-68.

In answering this question in the affirmative, the Court "decline[d] to create such a counterintuitive gap in the FCA by imposing a legal requirement found nowhere in the statute's language." *SAIC*, 626 F.3d at 1269. A claim is "false" for purposes of Section 3729(a)(1) if the contract provision is material to the payment decision, even if the provisions does not expressly condition payment on compliance:

> In *Science Applications International Corp.*, the Court held that to establish the existence of a "false or fraudulent" claim on the basis of implied certification of a contractual condition, the FCA plaintiff . . . must show that the contractor withheld information about its noncompliance with material contractual requirements. The existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality, but it is not . . . a necessary condition.

Op. at 10 (citing *SAIC*, 626 F.3d at 1269). See also, *United States v. Kellogg Brown & Root Servs., Inc.*, 12-cv-4110-SLD-JAG, *13-14 (C.D. Ill. March 31, 2014) ("*Kellogg Brown*") (Appendix A to Relator's Opp'n. to Def.'s Mot. for Summ. J.)

The Circuit Court further explained that the risk of an overly broad application of its holding to minor or ministerial contract provisions is sufficiently mitigated by the separate FCA elements of "materiality" and "scienter."[6] The violation of a minor contract provision that is immaterial to payment cannot serve as the basis for FCA liability under the legal (or implicit) falsity theory. Similarly a claim submitted without the requisite scienter (technically, "knowledge" under the FCA) precludes FCA liability. *Id*. at 1270. Thus under SAIC, the

---

[6] As the Court has acknowledged, actual damages are not an element of FCA liability. May 27, 2014 Mem. Op. at 23 n.9 (and citations therein).

provision must expressly condition payment on compliance.  If it does not, the provision must at least be material to payment.

"A false statement is material if it 'has a natural tendency to influence agency action or is capable of influencing agency action.'"  May 27, 2014 Mem. Op.at 23 (citing *United States ex rel. Fago v. M&T Mortgage. Corp.*, 518 F. Supp. 2d 108, 118 (D.D.C. 2007).  As this Court explained in another recent case involving the same Defendant, a contract provision is material where the Government "may not have paid" has it known that the claim failed to disclose the violation:

> Put another way, the government must show that had it "known of the falsity [of the claims submitted], it may not have paid."

*United States v. Kellogg Brown & Root Srvs., Inc.*, 800 F. Supp. 2d 143, 158 (D.D.C. 2011) (citing *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir 2010) ["a false certification-regardless of whether it is implied or express-is actionable under the FCA only if it leads the government to make a payment which, absent the falsity, it may not have made"]).[7]

As discussed below, the evidence here clearly satisfies both the express condition to payment and material to the payment options described in *SAIC*:  the first because the regulations and contract provisions expressly condition payment on compliance with those provisions; and the second because (*inter alia*) the Administrative Contracting Officer has stated that had the Government known that the Defendant maintained or supplied inflated MWR usage documentation, it "may not have paid."  *Kellogg*, 800 F. Supp. 2d at 158.

---

[7] The other element, scienter ("knowledge" under the FCA), is not the focus of the Opinion.  The FCA defines "knowingly" to include actual knowledge, reckless disregard or deliberate indifference.  FCA § 3729(b)(1).  It "require[s] no proof of specific intent to defraud."  FCA § 3729(b)(1).

b.   The Evidence.

With regard to Section 3729(a)(1) falsity, and in particular the legal falsity described in

*SAIC* that addresses contract provisions that expressly condition payment upon compliance with

the provision or do not expressly condition payment on compliance but are still material, here the

applicable regulations and contract provisions mandate as follows:

- o  FAR 52.216-7 and 16.303-1 (only allowable costs may be billed);

- o  FAR 52.216-7(a)(1) (2000) ("The Government shall make payments to the Contractor . . . in amounts determined to be allowable by the Contracting Officer in accordance with Subpart 31.2 of the [FAR]");

- o  FAR 31.201-2(a)(1)) (to be allowable, costs must be "reasonable");

- o  FAR 31.201-3(a) ("A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. . . . No presumption of reasonableness shall be attached to the incurrence of costs by a contractor.  If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.   (b) What is reasonable depends upon a variety of considerations and circumstances, including— (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance; (2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations; (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and (4) Any significant deviations from the contractor's established practices);

- o  FAR 31.201-2(d)) ("A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements.  The contracting officer may disallow all or part of a claimed cost that is inadequately supported"); and

- o  FAR 31.201-3 ("No presumption of reasonableness shall be attached to the incurrence of costs by a contractor").

Thus Defendant was required to maintain records and supporting documentation that show that its claimed costs are "ordinary and necessary for . . . contract performance, reflect "sound business practices," and respect its "responsibilities to the Government."   "No presumption of reasonableness" is created by the fact that the Defendant managed to submit a claim for costs or incurred the costs.   FAR 31.201-3.   If the Defendant fails to do so, "[t]he contracting officer may disallow all or part of a claimed cost that is inadequately supported." FAR 31.201-2(d).   The provisions therefore expressly condition payment on compliance.   The Defendant's claims are "false" under *SAIC*, because the Defendant failed to disclose that it failed to maintain (or more accurately, intentionally and systematically destroyed) the supporting documentation and by maintaining supporting documentation with inflated MWR usage numbers.

As noted, "[t]he existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality, but it is not . . . a necessary condition."   *SAIC*, 626 F.3d at 1269.   A claim is also false if "the contractor withheld information about its noncompliance with material contractual requirements."   *Id*.   A requirement if the Government "may not have paid" had it know about the violation.   *Kellogg*, 800 F. Supp. 2d at 158.

Here, the short answer is that provided by the LogCAP III and task order 59 Administrative Contracting Officer himself –had he known the Defendant was maintaining or supplying inflating MWR usage records, such knowledge might have affected his decision as to whether Defendant's claimed MWR costs were allowable:

Also, in Relator's Exhibit 34, the LOGCAP III Administrative Contracting Officer attests that,

11

> "[i]f the contractor created and then maintained or supplied to DCMA false, inflated tallies of MWR visitors and I became aware of the false nature of the tally or tallies, such discovery might have influenced me to undertake further review in order to ascertain whether all of the claimed costs were reasonable and allowable; and based on such inquiry, I might have concluded that some of the charged costs were unallowable."

May 27, 2014 Mem. Op. at 22 (quoting Rel. Ex. 34 ¶ 8).[8]

This evidence is dispositive under *SAIC* and *Kellogg*, but it is also bolstered here by much corroborating evidence, *viz*:  **(1)** the LogCAP III contract required Sitreps, Dkt. No. 199 Ex. 3 at 7, and Sitreps reported MWR usage data, *e.g.*, *id*. Ex. 4; **(2)** Defendant provided MWR usage data to the Government in monthly and yearly Logistics Reports, *e.g.*, *id*. Exs. 5, 10-11; **(3)** Defendant proposed its reasonable costs for billing under upcoming periods under LogCAP III using MWR usage data in Basis of Estimate reports to the Government, *id*. Ex. 1 (Task Order 89); **(4)** Defendant's internal manual on the LogCAP III methodology for reporting MWR headcounts in Sitreps warns that "Reporting any other [MWR headcount tally] number not matching the actual records will be **FRAUD,** *see* May 27, 2014 Mem. Op. at 21 (citing Rel. Ex. 6 [KBR_MCBE 000007020]); **(5)** Defendants' MWR Regional Manager stated that she "'can't express how important'" the Defendant's MWR headcount figures were in order for Defendants to "get the credit we deserve," *id*. (quoting Rel. Ex. 14); **(6)** Defendant used MWR usage data in presentations to the Government seeking higher incentive award fee awards, *id*. at 22 (citing

---

[8]  The Defendant points out that the Administrative Contracting Officer also states that he did not rely on MWR headcounts.  This disregards *SAIC* and the cost-plus reimbursement requirements.  Under *SAIC*, the test is whether such knowledge would have been capable of affecting payment.  By definition, this inquiry focuses on the agency's reaction to information that it did not possess.  The cost-plus reimbursement safeguards require the contractor to "maintain" (not "submit") the supporting documentation.  Otherwise, every cost-plus contract would turn into a universal audit.  Consistent with these safeguards, the Administrative Contracting Officer explicitly refers not only to supplying inflated MWR usage data but also to "maintaining" such data.

Relator Exs. 15 and 6); **(7)** level of effort records routinely were examined by the Government to assess (*inter alia*) "how many people does it take to do a certain service" and thereby ascertain whether KBR's costs were "reasonable," *e.g.*, Dkt. No. 196 Ex. 1 at 98-99 & Ex. 2 at 168; and **(8)** Defendant stopped inflating headcounts immediately after Ms. McBride refused to participate in such inflation and instead reported it to her supervisors (after which the promptly was terminated).  Dkt. 199 at 17.[9]

In short, there is explicit, direct and corroborating evidence that the Defendant's destruction of its MWR usage records, creation and maintenance of inflated MWR usage records, and any reporting of inflated MWR usage data to the agency was "capable of influencing agency action."

II.  <u>False Records/Statements Under Section 3729(a)(2).</u>

  a.  The Law.

Section 3729(a)(2) imposes liability upon any person who . . . (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent clam paid or approved by the Government.  31 U.S.C. § 3729(a)(2) (2008).  Under this pre-FERA version of the False Claims Act, presentment of the false record to the Government is not required, but "a plaintiff asserting a § 3729(a)(2) claims must prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 665 (2008).  "What § 3729(a)(2) demands is not proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or

---

[9]  In addition, if headcounts were immaterial, then why did Defendant stop inflating them after Ms. McBride reported the practice?  Recall that at the time, Defendant itself referred to any such inflation as "**FRAUD**."

statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government'." *Allison*, 553 U.S. at 671.

> b. The Evidence.

The evidence satisfies this requirement for a number of reasons. <u>First</u>, as explained above, the creation and maintenance of the supporting documentation was required by the LocGAP III contract to have a record on which the Government can always examine alllowability. Thus as a matter of law and fact, the Defendant had to create these records in order to ensure payment. <u>Second</u>, the contract required Sitreps, and Sitreps contained MWR usage data. Creating and maintaining records in order to meet a contractual reporting requirement tends to show that the Defendant did so in order to get paid. <u>Third</u>, the Defendant plainly used its MWR usage records in an effort to get paid. For example, it lauded its MWR usage data in presentations to the Awards Fee Board seeking the highest possible award fee. <u>Fourth</u>, the Administrative Contracting Officer stated in his declaration that knowledge of false MWR usage records might have impacted his decision on whether to pay the Defendant's claims.[10] Thus there is evidence that the MWR usage records were intended to be used exactly as it was required to use them and in fact used them – to get money from the Government.[11]

---

[10] The Administrative Contracting Officer's declaration is predictable, because the costs "ordinary and necessary" to service (for example) 5 people likely is less than the costs "ordinary and necessary" to service 500 people. This "reasonableness" decision was the <u>agency's</u> to make, and the Defendant was legally obliged to preserve the agency's ability to do so by maintaining accurate supporting documentation.

[11] Obviously the purpose of the cost-plus contract reimbursement regimen is to enable the Contracting Officer meet her obligation to safeguard limited taxpayer money. The Court may recall that during this same period there were frequent reports of troops lacking body armor and vehicles lacking armor.

III. <u>The Opinion</u>.

The Opinion states that:

> Relator McBride has not produced any evidence that these usage figures bore any relationship to the number of people that Defendants needed to employ to staff the MWR facilities appropriately.  Furthermore, although the Court provided her with several opportunities to do so, Relator McBride was unable to point to anything in the record that indicated that Defendants relied on these usage figures, inflated or otherwise, to calculate the number of people they needed to hire to staff these facilities.

Op. at 16.  Similarly with regard to the issue of legally false claims under Section 3729(a)(1) and

*SAIC*, the Opinion states that McBride "failed to show how Defendants' head count figures were

related to this issue."  Op. at 16.

This statement disregards the contract's requirements and *SIAC*.  Under *SAIC*, the Section

3729(a)(2) question is whether the contract requirements expressly condition payment on

compliance; or if not, whether the provisions nonetheless are material to (capable of affecting)

the payment decision.  As discussed at length above, the evidence satisfies both of these

requirements.  The contract conditions payment on the maintenance of records and supporting

documentation that show that the costs are "reasonable" (*i.e.*, "ordinary and necessary for . . .

contract performance," reflect "sound business practices," and respect the contractor's

"responsibilities to the Government").  The second option under *SAIC*, which requires a violation

of a material contract provision, is satisfied because the Administrative Contracting Officer said

so in his declaration; and because there is a great deal of corroborating evidence (described

above) that MWR usage data was capable of affecting payment and even provided to the

Government.

Furthermore, the issue with respect to liability under Section 3729(a)(1) is not whether

the <u>Defendant</u> "relied" on the false records as the above Opinion quotation intimates, but rather

15

whether the false records, if known to the <u>agency</u>, might have affected the <u>agency's</u> payment decision – in other words, the FCA element of "materiality."[12]  The Administrative Contracting Officer has stated that it might.  Moreover, he never had the chance to "rely" on the MWR usage data because the Defendant destroyed or inflated it.[13]

The Opinion states:

As Defendants' counsel demonstrated at oral argument, the payment vouchers that Defendants submitted for payment included line items for personnel costs.  These costs were based on the time sheets that Defendants' employees completed for the hours they worked and the hourly rate to which these employees were entitled under their employment contracts.  Relator McBride does not dispute these facts, and she further concedes that the vouchers were not factually false. In other words, she does not contend that Defendants submitted payment vouchers for employees who did not work or for more hours than these employees actually worked.

Op. at 16-17.  Again, the issue is legal falsity and not factual falsity.  Under the theory of legal falsity and *SAIC*, the question of whether a defendant's payment vouchers contain false hours or other representations that are factually false is irrelevant.  By definition, the theory of legal falsity addresses FCA Section 3729(a)(1) violations that do not depend upon false information in the  claim itself (but rather the withholding of information about a violation of a contract requirement).

---

[12]   Again, the materiality inquiry by definition is hypothetical -- it asks for the agency's reaction to information it did not know.

[13]   Although Defendant's reliance is immaterial to its FCA liability, its actions suggest that not only the Government but also the Defendant viewed MWR usage data as capable of affecting payments under LogCAP III.  For example, Defendant's task order 89 Basis of Estimate used MWR patronage to support its proposed reasonable costs.  Defendant also made presentations to the Government in which it explicitly relied on MWR usage data in order to seek the highest possible award fee.

The Opinion also states that Ms. McBride "does not contend that Defendants failed to maintain accurate time sheets or that personnel costs were not allowable costs."  Op. at 17.[14] Under her Section 3729(a)(1) claim, Ms. McBride alleges that the Defendants failed to maintain accurate MWR usage data; created and maintained inflated MWR usage records; and supplied inflated MWR usage data; and thereby violated contract requirements that condition payment on compliance with those provisions.  *SAIC*.  Alternatively under *SAIC*, Relator alleges that these contract provisions were material, *i.e.*, at least capable of affecting payment.  Whether Defendant "failed to maintained accurate time" or billed unallowable cost is simply not in issue.  The costs already have been allowed.  The issue now, in this FCA case, is whether the Administrative Contracting Officer, had he known of the violations, might have disallowed any of the claimed costs.  He has answered this question directly in the affirmative.  With regard to Section 3729(a)(2), the documents in issue include the inflated MWR usage records, the Logistics Reports (reporting MWR patronage), and the MWR usage numbers in the Award Fee Board presentations (the latter two of which were submitted to the Government).  Time sheets have nothing to do with these allegations.

Relatedly, the Opinion states:

> Rather, she appears to argue that these personnel costs were not reasonable or necessary.  The problem with this argument, however, is three-fold.  First, Relator McBride does not dispute that Defendants maintained time sheets for their employees and sought payment for only those employees who worked and only for those hours that those employees actually worked.  Thus, the personnel costs that appeared on the payment vouchers based on these records were both reasonable and necessary.

---

[14]   As is true with a number of the statements in the Opinion, it seems unclear whether this statement relates to Section 3729(a)(1) liability or Section 3729(a)(2) liability (or to which element).  Both are therefore addressed.

Op. at 17.  This statement seems to address a factual falsity theory and not a legal falsity theory

under *SAIC*.  Relator does not contend that Defendant maintained false time sheets or submitted

false hours-worked claims.[15]

> Continuing, the Opinion states:
>
> Second, she has failed to produce any evidence to rebut Defendants'
> determination that the number of people they employed was reasonable and
> necessary to maintain the MWR facilities at Camps B-3 and B-4 during the
> relevant timeframe based on such factors as the number of people who were based
> at those camps, the services provided in those facilities, and the hours of
> operation.

*Id*.  This statement disregard the elements of a Section 3729(a)(1) violation and *SAIC*.  Under

Section 3729(a)(1) and *SAIC*, Relator must identify evidence that Defendant violated a contract

provision that conditions payment on compliance with the provision; or that was material to

(might have affected) the payment decision.  Whether the Defendant believes that its costs are

reasonable or makes a showing that its costs are reasonable is immaterial.  This is an FCA case,

not a Contract Disputes Act case.

> Lastly, the Opinion states:
>
> Third, Relator McBride has pointed to nothing in the record to demonstrate that
> the Government required Defendants to submit any head count figures as a
> condition for payment.

*Id*.  Section 3729(a)(1) and legal falsity under *SAIC* do not require that the Defendant submit any

headcount figures as a condition of payment.  They require falsity and materiality.  The

submission of headcounts to the Government in order to obtain payment would trigger a factual

---

[15]   Any assertion that the correct transference of hours worked to time sheets to payment
vouchers somehow establishes the reasonableness of the costs is entirely mistaken.  A contractor
can pay 20 people to plant a flower, correctly record their time in time sheets and then bill that
time, but this in no way, shape or form would make such claimed costs "reasonable" and
"allowable."

falsity analysis.  Under Section 3729(a)(2), the submission or presentment of the false record or statement to the Government simply is not required.  *Allison*, 553 U.S. at 665, 671.

## CONCLUSION

For the reasons explained above, Relator respectfully submits that the Opinion's assessment of the evidence clearly strays from the challenged elements of Relator's claims and the theory of legal falsity clearly set forth in *SAIC*.  An assessment of the evidence that applies the elements of Relator's claims, the Court of Appeals' decision in *SAIC*, and the Supreme Court's decision on Section 3729(a)(2) in *Allison Engine*, reveals an abundance of evidence to support Relator's claims and clear error in the Opinion.  Relator therefore respectfully asks the Court to alter or amend the Opinion, to vacate the Judgment, to issue an Order that denies the Defendants' Motion for Reconsideration, and to set the earliest possible trial date.

Respectfully submitted,

_____/s/_____
Victor A. Kubli, No. MD012917
kubli@kublilaw.com
LAW OFFICE OF VICTOR A. KUBLI P.C.
13948 Bromfield Road
Germantown, MD 20874
Tel.:  (301) 801-2330

Counsel to *Qui Tam* Plaintiff

January 7, 2015

## **CERTIFICATE OF SERVICE**

I certify that on this 7th day of January 2015, the foregoing was filed via the Court's ECF system which is to serve a copy upon:

> Tirzah S. Lollar
> VINSON ELKINS L.L.P.
> The Willard Office Building
> 1455 Pennsylvania Avenue, N.W., Suite 600
> Washington, D.C. 20004
>
> John M. Faust
> Law Offices of John M. Faust, Esq.
> 1325 G Street, N.W., Suite 500
> Washington, D.C. 20005
> Attorneys for Defendants
>
> Darrell C. Valdez
> U.S. ATTORNEY'S OFFICE
> 555 Fourth Street, NW
> Washington, DC 20530
> Darrell.valdez@usdoj.gov

> _____/s/_____
> Victor A. Kubli